**REVISED AUGUST 15, 2002**

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 98-20385

_____

MAX ALEXANDER SOFFAR,

Petitioner - Appellant,

versus

JANIE COCKRELL, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent - Appellee.

Appeal from the United States District Court
For the Southern District of Texas

July 29, 2002

Before KING, Chief Judge, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER, and DENNIS, Circuit Judges.[*]

EMILIO M. GARZA, Circuit Judge:

---

[*]Judge Benavides concurs in the judgment and the opinion except for Part VII. Judges Wiener and Stewart concur in the judgment only. Judge Clement did not participate in this decision.

Petitioner Max Alexander Soffar ("Soffar"), a Texas state prisoner convicted of capital murder, seeks a certificate of probable cause ("CPC") to appeal the district court's dismissal of his application for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. A panel of this court, construing Soffar's petition as a request for a certificate of appealability ("COA") under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1269, granted him a COA on three of his claims. *See Soffar v. Johnson*, 237 F.3d 411 (5th Cir. 2000), *reh'g en banc granted*, 253 F.3d 227 (5th Cir. 2001). The panel resolved one of Soffar's claims on the merits, concluding that he had made a substantial showing of the denial of his Fifth Amendment rights. The panel granted Soffar habeas relief on this issue, holding that Soffar had invoked his right to counsel during his interrogation, and that the interrogating officer's misleading statements about appointed counsel invalidated any waiver of Soffar's rights. We granted rehearing en banc, thereby vacating the panel opinion. *See* FIFTH CIR. R. 41.3. We reinstate the rulings of the panel concerning the grant or denial of COA as to all issues raised by Soffar.[1] In this opinion, we only address the merits of Soffar's Fifth Amendment claim.

**I**

Four young employees at a bowling alley were each shot in the head during a late-night

---

[1] The panel granted Soffar a COA on two other claims: (1) whether the use of evidence relating to an extraneous offense during the penalty phase was tainted by a violation of Soffar's Sixth Amendment rights; and (2) whether Soffar was denied the effective assistance of counsel when his trial counsel failed to develop and present certain evidence during the guilt phase. We do not consider the merits of either of these claims. Because the panel opinion did not discuss these claims in any detail, we remand them to the panel for consideration on the merits. *Soffar*, 237 F.3d at 446 ("By virtue of the fact that our grant of relief with respect to Soffar's Fifth Amendment challenge would render discussion of the merits of these additional issues unnecessary, we likewise need not belabor the justifications for granting a COA on those issues."). The panel denied Soffar a COA on all other claims presented, and these denials are also reinstated.

-2-

burglary in Houston in 1980. A few weeks later, police stopped Soffar for speeding, and arrested him after learning that the vehicle was stolen. On the ride to the police station, Soffar spontaneously told the arresting officer that he "wasn't going to jail for some little motorcycle theft," and hinted that he was involved in the bowling alley killings in Houston. At the police station, Officer Clawson ("Clawson") was summoned to help interrogate Soffar. Soffar had previously worked as an informant for Clawson and considered him to be a friend. Before he began questioning Soffar about the bowling alley killings, Clawson gave him his third Miranda warning of the day. Soffar had received two warnings prior to his arrival at the police station, one from the arresting officer and another from a magistrate judge.

After briefly talking to Clawson, Soffar was questioned by Detective Gil Schultz ("Schultz"), who gave Soffar another set of Miranda warnings before beginning his interrogation. Schultz later testified that Soffar told him certain details of the crime that only the perpetrator would know. About thirty minutes later, Schultz came out of the interrogation room and told Clawson that he had "hit a brick wall" with Soffar.[2] Clawson entered the room alone to speak with Soffar.

According to Clawson, the following dialogue occurred during his second interview with Soffar. Soffar asked whether he should talk to the police or obtain an attorney; Clawson responded that "if he was involved in the crime he should tell the detective he was in it; otherwise he should get a lawyer." Soffar then asked how he could get a lawyer, and Clawson asked him if he could afford a lawyer, knowing that he could not. Soffar laughed, and asked how he could get a court-appointed attorney, and when he could get one. Clawson responded that he did not know Harris County

---

[2] This statement is the subject of some dispute. At the state habeas hearing, Schultz denied ever "hitting a brick wall" with Soffar, and testified that Soffar spoke freely with him throughout the interview.

procedures, and guessed that it could take as little as one day or as long as a month. Clawson knew that Houston had a 72-hour rule—which states that a suspect must be charged or released within that time period—but did not tell Soffar about it. Soffar then spat into a trash can, and said "so you're telling me I'm on my own." Clawson remained silent.[3] Afterwards, over the course of three days, Soffar signed three written statements confessing to the murders. The confessions were crucial to his conviction, because there was no physical evidence linking Soffar to the crime.

Based on this conversation, the panel majority granted Soffar habeas relief. On rehearing en banc, we must decide: (1) whether Soffar knowingly and voluntarily waived his Miranda rights; (2) whether Soffar invoked his right to remain silent; (3) whether Soffar invoked his right to counsel; and (4) whether Clawson's misleading statements about the availability of counsel invalidated Soffar's prior waiver of his rights.

## II

In this pre-AEDPA case, we review the district court's legal conclusions de novo, and the state court's findings of fact for clear error. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). We must accord a presumption of correctness to all findings of fact if they are supported by the record. *See* 28 U.S.C. § 2254(d) (1994) (repealed 1996); *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994). We review mixed questions of law and fact de novo. *Crane*, 178 F.3d at 312. The ultimate voluntariness of statements elicited during a confession is such a mixed question. *See Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998); *Lord v. Duckworth*, 29 F.3d 1216, 1221-22 (7th Cir. 1994). Whether a suspect invoked his right to counsel is also a mixed question of law and fact. *See*

---

[3] At the state habeas hearing, Clawson testified that he affirmatively replied, "yes, you are."

*United States v. De La Jara*, 973 F.2d 746, 750 (9th Cir. 1992). However, we must apply substantial deference to the findings of fact made by the state court in the course of deciding such claims. *Armstead*, 37 F.3d at 206; *Duckworth*, 29 F.3d at 1222 (discussing presumption of correctness afforded to subsidiary questions informing the state court's legal conclusions).

### III

Soffar received multiple Miranda warnings informing him of his rights during the course of his arrest and interrogation. If Soffar validly waived these rights, his subsequent statements are admissible. In order for a criminal suspect to validly waive his Miranda rights, two elements are necessary: (1) the relinquishment of the right must be "voluntary in the sense that it was the product of a free and deliberate choice"; and (2) the waiver must be made with "full awareness of the right being abandoned" and the consequences of doing so. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Despite receiving multiple Miranda warnings, Soffar continued to talk to the police, waiving his right to remain silent and his right to have an attorney present. First, shortly after Officer Raymond Willoughby arrested Soffar and read him his Miranda rights from a card, Soffar waived his Miranda rights by spontaneously volunteering incriminating statements about his involvement in the bowling alley murders. Next, after receiving Miranda warnings first from a magistrate and then from Clawson at the police station, Soffar stated that he understood his rights and waived them again by voluntarily telling the police about a potential accomplice, Latt Bloomfield. Finally, before Schultz began his interrogation of Soffar, he read Soffar his Miranda rights for the fourth time, and also warned Soffar that he could face the death penalty if convicted. Nonetheless, Soffar waived his rights and described the crime scene at the bowling alley to the police.

It is clear that Soffar made these statements with full knowledge of the consequences. As

described above, during the course of his interrogation, he was warned that he might face the death penalty if convicted, was given at least four Miranda warnings, including one set administered by a magistrate, and waived his Miranda rights at least three times. *See Moran*, 475 U.S. at 422-23 ("Once it is determined that [the suspect]. . .at all times knew he could stand mute and request a lawyer, and that he was aware of the state's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.").

In addition, there is no evidence indicating that Soffar's waivers were not fully voluntary. Soffar himself instigated the discussion about the bowling alley murders following his arrest for an unrelated crime. He was not threatened or coerced by the police, and continuously volunteered information about the crime during his interrogation. *Id.* at 421-22 (holding statement voluntary in absence of psychological or physical pressure, and noting that it was suspect who spontaneously initiated first conversation). It is "self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled." *Colorado v. Spring*, 479 U.S. 564, 576 (1987) (holding that suspect need not "know and understand every consequence of a waiver").

Once a suspect has waived his rights, the police are free to continue to question him. There is no requirement that a suspect be continually reminded of his Miranda rights following a valid waiver. *United States v. Anthony*, 474 F.2d 770, 774 (5th Cir. 1973); *United States v. Taylor*, 461 F. Supp. 210, 214 (S.D.N.Y. 1978); *see also United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997) (holding that "re-warning is not required simply because time has elapsed"); *Evans v. McCotter*, 790 F.2d 1232, 1237-38 (5th Cir. 1986) (ruling that a suspect who was given two Miranda warnings was not entitled to another one three hours later). Therefore, we conclude that Soffar

knowingly and voluntarily waived his rights, and any statements following such waiver were admissible.

**IV**

Soffar argues that he invoked his right to remain silent at some point during the interview with Schultz. To support this claim, he relies on Schultz's statement to Clawson that he had "hit a brick wall" with Soffar. *See Kelly v. Lynaugh*, 862 F.2d 1126,1130 (5th Cir. 1988) (holding suspect invoked right to remain silent by declining to talk). Once warnings are given, if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966). If Soffar had invoked this right, his subsequent statements would be inadmissible unless the police "scrupulously honored" his right to cut off questioning. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (holding admissibility of statements obtained after person in custody has decided to remain silent is case-by-case inquiry depending on whether police respected suspect's request). We do not agree, based on the record before us, that Soffar invoked his right to remain silent.

Schultz's statement, standing alone, does not support an inference that Soffar had invoked his right to remain silent.[4] At the outset, based on Soffar's prior conduct and the fact that he

---

[4] We note that the state habeas court rejected the argument that such a statement would constitute an invocation. In its findings of fact, the state court found that "the applicant's refusal to talk to certain officers or in the presence of certain officers was not an invocation of the applicant's right to remain silent." *See State Habeas Findings of Fact and Conclusions of Law* at 78, ¶ 9. We have previously found the question of whether a suspect invoked his right to silence to be a factual determination made by the state court. *West v. Johnson*, 92 F.3d 1385, 1403 (5th Cir. 1996) ("The record fairly supports the underlying factual determination of the Texas courts that West did not invoke his right to silence."). Thus, we must defer to such finding. *See Loyd v. Smith*, 899 F.2d 1416, 1425 (5th Cir. 1990) (discussing requirement of federal courts to grant presumption of correctness to state court's explicit and implicit findings of fact). The ultimate admissibility of the statements, however, is a legal conclusion we must review de novo. *West*, 92 F.3d at 1402-3

-7-

continued the interrogation with Clawson after Schultz left the room, it does not appear that he

wanted to stop talking. *See, e.g., Barnes*, 160 F.3d at 224 (finding no invocation of right to silence

when viewed in light of suspect's prior statements and fact that suspect initiated discussion); *West

v. Johnson*, 92 F.3d 1385, 1403 (5th Cir. 1996) (holding detective's testimony that suspect said he

"didn't want to tell us anything about it," was not an invocation of the suspect's right to remain silent,

but rather a denial of involvement in the crime).

Moreover, courts have adopted fairly strict standards when evaluating claims of invocation

of silence.[5]  A third-party statement expressing frustration over the suspect's unwillingness to talk

does not meet this standard.  *See Barnes*, 160 F.3d at 224-25 (holding that when suspect answered

"no" to question of whether he waived his right, this was not invocation because it was evident he

---

("[T]here is independent federal determination of the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution.").

[5] We decline to address whether the *Davis* standard should be applied to invocations of the right to remain silent.  In *Davis v. United States*, discussed in Part V of this opinion, the Supreme Court held that a suspect must unequivocally assert his right to request counsel.  512 U.S. 452, 459 (1994).  We have previously held that application of such a rule to the invocation of silence is not contrary to clear Supreme Court law under AEDPA.  *See Barnes*, 160 F.3d at 225.  We note that other circuits that have addressed this issue—including the Sixth, Seventh, Eighth, and Eleventh—have held that the *Davis* rule applies equally to the right to remain silent.  *See United States v. Banks*, 78 F.3d 1190, 1197 (7th Cir. 1996) (holding that the response "I don't got nothing to say" was ambiguous in the context of suspect's other comments because it could be construed as an angry response), *rev'd on other grounds, Mills v. United States,* 519 U.S. 990 (1996); *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995) (determining whether the suspect's statements "indicate an *unequivocal* decision to invoke the right to remain silent" (emphasis added)); *Medina v. Singletary*, 59 F.3d 1095, 1100 (11th Cir. 1995) ("Law enforcement officers are not required to terminate an interrogation unless the invocation of the right to remain silent is unambiguous." (citing *Davis*)); *see also United States v. Hurst*, 228 F.3d 751, 759-60 (6th Cir. 2000) (citing *Davis* in implicitly holding that a suspect must assert "his right to remain silent sufficiently clearly"); *United States v. Ramirez,* 79 F.3d 298, 305 (2d Cir. 1996) (assuming, *arguendo*, that *Davis* applies to invocations of the right to remain silent, but not holding that it definitely does).

-8-

misunderstood the question and continued to talk); *Burket v. Angelone*, 208 F.3d 172, 200 (4th Cir. 2000) (holding statements such as "I just don't think I should say anything," are not clear assertions); *United States v. Ramirez*, 79 F.3d 298, 305 (2d Cir. 1996) ("Ramirez's silence in the wake of two questions, while answering others, did not constitute even an equivocal invocation of his right to remain silent.").

In light of these facts and the relevant case law, we conclude that Soffar did not invoke his right to remain silent, and therefore, the police were free to continue questioning him.

## V

Soffar argues that he invoked his right to counsel during his conversation with Clawson, and that his subsequent statements were therefore inadmissible.[6] In *Davis v. United States*, the Supreme Court held that law enforcement officers are not required to cease questioning when a suspect makes an ambiguous or equivocal request for counsel. 512 U.S. 452 (1994). An unambiguous statement "that can reasonably be construed to be an expression of a desire for the assistance of an attorney" is required under this stringent standard. *Id.* at 459. *Davis* established a bright-line rule, under which "a statement either is such an assertion of the right to counsel or it is not." *Id.*

Soffar's statements to Officer Clawson can be categorized as follows: he asked whether he should get an attorney; how he could get one; and how long it would take to have an attorney appointed. Courts have rejected each and every one of these questions as procedural, and too equivocal to constitute a clear invocation of the right to counsel. First, courts have rejected as ambiguous statements asking for advice on whether or not to obtain an attorney. *See United States*

---

[6] The panel opinion, applying a totality of the circumstances analysis, concluded that Soffar had unambiguously requested counsel. *Soffar*, 237 F.3d at 457.

*v. Posada-Rios*, 158 F.3d 832, 867 (5th Cir. 1998) (holding that a suspect's statement that she "might have to get a lawyer then, huh?" was not a clear request); *United States v. Cherry*, 733 F.2d 1124, 1130 (5th Cir. 1984) ("Why should I not get an attorney?" was not a clear request); *see also Davis*, 512 U.S. at 462 ("Maybe I should talk to a lawyer" was not a clear invocation).

Second, a suspect's question about how to obtain an attorney does not constitute an unambiguous assertion of his right. *See United States v. Cruz*, 22 F.3d 96, 98 (5th Cir. 1994) (holding that a suspect's statement that he was a "working man" who "couldn't afford an attorney" was not a clear request); *see also Duckworth*, 29 F.3d at 1220-21 (the statement, "I can't afford a lawyer but is there anyway I can get one?" was not a clear request).

Third, a suspect's inquiry into how long it would take to get an attorney is not a clear invocation. *See United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990) (finding question about how long it would take to get a lawyer, and whether suspect would wait in jail during the interim, was not a clear request); *United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) (holding "what time will I see a lawyer" was not a clear request).

While a suspect need not "speak with the discrimination of an Oxford don," he must nevertheless clearly articulate his desire to have an attorney present. *Davis*, 512 U.S. at 459. Soffar's questions did not rise to the level of an unambiguous invocation of his right to counsel under *Davis*.[7]

---

[7] We decline to place undue emphasis on a portion of Clawson's testimony at the state habeas hearing where he stated that he believed Soffar wanted an attorney. *See Soffar*, 237 F.3d at 431-32. Soffar has relied on this statement to support his argument that a reasonable officer would interpret Soffar's questions as an unambiguous request for counsel. We are not persuaded by this argument. First, it is contrary to the factual findings of the state court, which found that Clawson interpreted Soffar's questions as procedural. This particular statement is one among many made by Clawson at the hearing, and he repeatedly testified that he did not consider Soffar's questions to be a request for counsel. Second, the inquiry under *Davis* is an objective one, and Clawson's perception of Soffar's intent is irrelevant. *Davis*, 512 U.S. at 459; *see also Diaz v. Senkowski*, 76 F.3d 61, 64 (2d Cir.

-10-

## VI

Soffar validly waived his rights, and did not subsequently invoke his right to remain silent or his right to counsel. The only remaining question, then, is whether Clawson's misleading statements invalidated the multiple waivers Soffar had given *prior* to the interview. We conclude they do not.

Soffar relies on language from the Supreme Court's decision in *Miranda v. Arizona* to argue that any misleading statement, trickery or deceit by an interrogating officer invalidates a suspect's waiver. *See* 384 U.S. at 476 ("Any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege.").[8] We disagree with his interpretation. Subsequent cases interpreting *Miranda*'s language show that trickery or deceit is only prohibited to the extent it deprives the suspect "of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran*, 475 U.S. at 424. In this case, Soffar was well aware of his rights because he had been given numerous Miranda warnings and had waived his rights multiple times prior to his interview with Clawson. Furthermore, courts have found waivers to be voluntary even in cases where officers employed deceitful tactics. *See Spring,* 479 U.S. at 575 (holding waiver voluntary despite failure

1996) (holding suspect's intent is not a controlling factor, because officers cannot be guided by speculation as to suspect's intent).

[8] It is arguable whether Clawson's statements even rose to the level of misleading or deceitful. Clawson's statement about whether Soffar should speak to an attorney was clearly advice, and did not affect Soffar's knowledge of the fact that an attorney was available to him. Similarly, Clawson's statement about the length of time it would take to get an attorney does not change the fact that Soffar knew he could ultimately get one. Clawson's knowledge of the "72 hour" rule is irrelevant, as this relates to the period of time a suspect can be held without being charged. *See Davis*, 512 U.S. at 460 ("The primary protection afforded suspects to custodial interrogation is the Miranda warnings themselves.").

to inform suspect of potential subjects of interrogation); *United States v. Tapp*, 812 F.2d 177, 179 (5th Cir. 1987) (holding waiver voluntary even though officers failed to tell defendant he was target of investigation). *Cf. Illinois v. Perkins,* 496 U.S. 292, 297 (1990) (upholding use of undercover agents in jails to elicit incriminating statements).

We have previously rejected, in a case involving very similar facts, an argument of retroactive waiver based on misleading statements. *See De La Rosa v. Texas*, 743 F.2d 299 (5th Cir. 1984). In *De La Rosa*, a suspect was arrested and subsequently questioned by an officer he knew. Several sets of Miranda warnings were given before the interview, but during the interview the officer told him that "it [would] take some time" before a lawyer could be appointed. *Id.* at 302. We held the suspect's waiver was still valid, stating:

> We cannot accept the position that would have us ignore the repeated full and accurate warnings to focus only on the remark that appointing an attorney would take some time. The cumulative effect of the repeated incantations of *Miranda* and explanations in simpler language was such that De La Rosa was fully informed of his constitutional rights.

*Id.* at 302.

The Fourth Circuit has also held that misleading statements do not invalidate a prior waiver. In *Mueller v. Angelone*,[9] a suspect waived his Miranda rights and asked the police officer during the subsequent interrogation, "Do you think I need an attorney here?" 181 F.3d 557, 573 (4th Cir. 1999). The officer responded by "shaking his head slightly from side to side, moving his arms and hands in a 'shrug-like manner,' and stating, 'You're just talking to us.'" *Id.* at 573-74. The court

---

[9] *Mueller* applies AEDPA's deferential standard of review. However, the court does not suggest in its opinion that this was a close or difficult question to adjudicate, as it clearly states that the officer's conduct "did not serve to render Mueller's waiver involuntary, unknowing, or unintelligent." *Mueller*, 181 F.3d at 575.

rejected the suspect's argument that this exchange invalidated his prior waiver, stating that "[i]t is clear from the record that [the suspect], with his extensive experience in such matters, understood both his rights and the consequences of their abandonment. [The officer's] expression of his opinion on the advisability of [the suspect's] consulting with counsel could not change that understanding." *Id.* at 575.

The panel opinion concluded that Fifth Circuit precedent, as set forth in the *Nash* line of cases, compels the conclusion that deceptive clarifying questions can invalidate a suspect's prior waiver. *See Soffar,* 237 F.3d at 458. We disagree. The primary holding of these cases, that all questioning following an ambiguous invocation should be limited to clarifying questions, was overruled by the Supreme Court's holding in *Davis. See Nash v. Estelle*, 597 F.2d 513 (5th Cir. 1979) (en banc); *Thompson v. Wainwright*, 601 F.2d 768 (5th Cir. 1979); *United States v. Cherry*, 733 F.2d 1124 (5th Cir. 1984). In dicta, our opinion in *Nash* stated that an officer could not "utilize the guise of clarification as a subterfuge for coercion or intimidation," but the case itself did not involve any clarifying statements used to mislead a suspect. *Nash*, 597 F.2d at 517 (holding that clarifying questions are permissible after an ambiguous invocation, and ultimately holding that suspect did not invoke right to counsel). Likewise, *Cherry* noted in dicta that clarifying questions "cannot be used as a means of eliciting any incriminating statements." *Cherry*, 733 F.2d at 1130 (holding that when an equivocal request for counsel is made, the scope of interrogation must be limited to clarification). And in *Wainwright*, the court held that an officer's question was not limited to clarification and was therefore impermissible, but noted only that "the limited inquiry permissible after an equivocal request for legal counsel may not take the form of an argument between interrogators and suspect about whether having counsel would be in the suspect's best interests." *Wainwright,* 601 F.2d at 772.

-13-

**VII**

Moreover, even if the *Nash* line of cases is applicable to the facts of this case, Soffar would be barred from relying on them by the non-retroactivity principle set forth in *Teague v. Lane*, 489 U.S. 288 (1989). In *Teague*, the Supreme Court held that a new rule of law will not be applied on collateral review to cases that became final prior to the announcement of the new rule. *Id.* at 310. In determining whether a rule is "new," we must "survey the legal landscape as it then existed and determine whether a state court considering the defendant's claim at the time his conviction became final would have felt *compelled* by existing precedent to conclude that the rule he seeks was required by the Constitution." *Fisher v. Texas*, 169 F.3d 295, 305 (5th Cir. 1999) (citations omitted) (emphasis added).

In order to qualify as existing, a rule must be dictated by Supreme Court precedent, not circuit court precedent. *See, e.g., Lockhart v. Fretwell,* 506 U.S. 364, 375-76 (1993) (Thomas, J., concurring) (discussing fact that "neither federal supremacy nor any other principle of federal law requires a state court's interpretation of federal law give way to a (lower) federal court's interpretation"); *Burdine v. Johnson,* 262 F.3d 336, 341 (5th Cir. 2001) (en banc) (describing relevant inquiry under *Teague* as "whether a state court in 1987 would have felt compelled by Supreme Court precedent"); *Glock v. Singletary*, 65 F.3d 878, 885 (11th Cir. 1995) (holding that federal courts of appeals "do not 'dictate' a particular rule to state courts"). *But see*, *e.g., Williams v. Taylor,* 529 U.S. 362, 380-82 (2000) (Stevens, J. for four Justices) (discussing how AEDPA codifies *Teague*, yet extends the principle of *Teague* by limiting source of doctrine on which courts may rely in addressing habeas applications to Supreme Court precedent); *Bell v. Hill*, 190 F.3d 1089, 1093 (9th Cir. 1999) (holding that state courts can be compelled to follow federal circuit case law

if "foreordained" by Supreme Court precedent). Because the rules in *Nash, Cherry* and *Wainwright* prohibiting deceptive clarifying questions have never been dictated by the Supreme Court, we do not believe a state court, at the time Soffar's conviction became final, would have felt compelled to follow the holdings of these cases. Soffar has failed to show his prior waivers were invalidated by Clawson's misleading statements; thus, his valid waivers were still in effect and his subsequent statements were admissible.

## VIII

Based on the foregoing reasons, we AFFIRM the district court's denial of Soffar's Fifth Amendment claims raised in his habeas petition. We also REINSTATE the panel's rulings granting or denying a COA as to each claim raised by Soffar. We REMAND to the panel for consideration on the merits of the outstanding issues for which a COA has been granted. *See* footnote 1.

DeMOSS, Circuit Judge, with whom PARKER and DENNIS, Circuit Judges, join, dissenting:

Because I disagree with the en banc majority's interpretation of the case law applicable in this case, and because I disagree with the en banc majority's application of such law to the facts which are not disputed in this case, and because the en banc majority completely fails to address a ground for relief asserted by Soffar in this case, I respectfully dissent and write to express my reasons for such dissent.

## I. Misinterpretation of Law

I have two serious disagreements with the legal analysis and reasoning of the en banc majority. First of all, the en banc majority states as a matter of established law that "in order to qualify as existing, a rule must be dictated by Supreme Court precedent, not Circuit Court precedent." ___ F.3d at ___. In support of this legal principle, the en banc majority cites *Lockhart v. Fretwell*, 506 U.S. 364 (1993), and, specifically, the concurring opinion of Justice Thomas in that case. I note, however, that no other Justice on the Supreme Court joined in

Justice Thomas' concurring opinion; and, while Justice Thomas' soliloquy on the "supremacy clause of the U.S. Constitution" is academically accurate, the issue that he discusses had absolutely no applicability to the decision making of the majority opinion in *Fretwell*. Furthermore, Justice Thomas' concurring opinion does not speak at all to the issue for which the en banc majority cites it, i.e. that only Supreme Court precedent (and not Circuit Court precedent) can be used in determining what is "existing precedent" in applying the *Teague v. Lane*, 489 U.S. 288 (1989), anti-retroactivity rule. Even the majority opinion in *Lockhart v. Fretwell* does not address the issue for which the en banc majority cites it. To the contrary, the majority opinion in *Fretwell* points out: "The new rule principle, therefore, validates reasonable good faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Fretwell*, 506 U.S. at 372-73 (citing *Butler v. McKeller*, 494 U.S. 407, 414 (1990)). Note that the term "existing precedents" is not qualified as the en banc majority obviously wishes it were by the phrase "of the Supreme Court."

And this quotation from *Fretwell* brings up the second major dispute I have with the en banc majority's legal analysis. Towards the end of its opinion, the en banc majority states: "Because the rules in *Nash*, *Cherry*, and *Wainwright* prohibiting deceptive clarifying questions have never been dictated by the Supreme Court,

-17-

we do not believe a state court at the time Soffar's conviction became final would have felt compelled to follow the holding of these cases."[10]  Obviously, the en banc majority did not conduct a very thorough "survey of the legal landscape" at the time Soffar's conviction became final in October 1989.  The en banc majority clearly missed the Texas Court of Criminal Appeals' en banc decision in *Russell v. State of Texas*, 727 S.W.2d 573 (Tex. Crim. App. 1987).  In *Russell*, the Court of Criminal Appeals expressly reviewed and discussed the Fifth Circuit's holdings in *Nash* and *Wainwright* and recognized the following rule, which it acknowledged had been applied by several of the courts of appeals in Texas:

> When an accused's desires are related in an equivocal manner, the interrogating officers are not required to automatically cease the interview. Instead, they are allowed to continue questioning; however, the questions must be specifically aimed at discovering the accused's true desire. Further, any interrogating officer may not use the guise of clarification in order to coerce or intimidate the accused into making a statement.  Nor may it be used to elicit further information about the event in question.  (Emphasis added.)

*Russell*, 727 S.W.2d at 577.  Later, in this same opinion, the Texas Court of Criminal Appeals stated:

> In the instant case appellant never vocalized a desire to have counsel present.  He merely sought opinions as to the necessity of having counsel present.  Given the fact that appellant's comments were clearly aimed at the necessity of having

---

[10]*See Nash v. Estelle*, 597 F.2d 583 (5th Cir. 1979) (en banc); *Thompson v. Wainwright*, 601 F.2d 768 (5th Cir. 1979); *United States v. Cherry*, 733 F.2d 1124 (5th Cir. 1984).

> counsel present during interrogation, we will give
> him the benefit of the doubt. Thus, when appellant
> inquired of the interrogating officers whether they
> thought it necessary to have counsel present, the
> officers were under a duty to clarify appellant's
> desires if they wanted to continue the
> interrogation.

*Id*. at 578 (citations omitted). Consequently, in my view, there is

no need to speculate (as the en banc majority seems want to do)

about whether the Texas Court of Criminal Appeals "would have felt

compelled to follow the holdings of these cases." Rather, the

Texas courts did in fact adopt the holdings in **Nash** and **Wainwright**.

Finally, the en banc majority asserts the proposition that the

holdings of **Nash**, **Wainwright**, and **Cherry** that "all questioning

following an ambiguous invocation of the right to counsel [should]

be limited to clarifying questions" was overruled by the Supreme

Court's decision in **Davis v. United States**, 512 U.S. 452 (1994). [11]

The Supreme Court in **Davis** clearly recognized that in granting

certiorari in that case it was doing so in order to decide "how law

enforcement officers should respond when a suspect makes a

reference to counsel that is insufficiently clear to invoke the

**Edwards** prohibition on further questioning"; and it recognized that

the Court had twice previously noted the varying approaches of the

lower courts and that the Court was granting certiorari in order to

address the issue on the merits. I agree with the en banc majority

---

[11]**Davis** is a non-capital case heard by the Supreme Court on direct appeal from the Court of
Military Appeals some five years after Soffar's conviction became final.

that from and after the date of the **Davis** opinion, i.e. June 24, 1994, the **Davis** opinion would be deemed to have overruled the portions of **Nash**, **Wainwright**, and **Cherry** which would have <u>required</u> clarifying questions when the suspect makes an ambiguous reference to the need for a lawyer.  But **Davis** really does not speak to the question of what happens if the interrogating officer does get into a dialogue with the suspect (as occurred here in **Soffar**) nor whether the interrogating officer can utilize that dialogue to persuade, trick, or cajole the suspect into waiving his **Miranda** rights (as happened here in **Soffar**).

### II. Application of Law to Facts

I turn now to my disagreements with the en banc majority's application of the law to the facts involved here in **Soffar**.  I can think of no better way to open this discussion than to quote two pertinent sentences from the majority opinion, as follows:

> Afterwards, over the course of three days, Soffar signed three written statements confessing to the murders.  <u>The confessions were crucial to his conviction, because there was no physical evidence linking Soffar to the crime.</u>

___ F.3d at ___ (emphasis added.)  These two sentences encapsulate the circumstances that take this case out of the ordinary run of the mill situation involving a suspect's confession and put it in the category of special, unique, peculiar, and unusual.  Some brief

-20-

elaboration is appropriate.

Note, first of all, that Soffar was held in police custody for three days without benefit of access to counsel. He signed three different written statements. There are substantial inconsistencies between those three statements. The statements were typewritten by the interrogating officers outside of the presence of Soffar, and were based on the interrogator's recollection of the dialogue that occurred between Soffar and the interrogator. No video tape or audio tape recording was made of any of these interrogations; and there was, therefore, no verbatim typewritten transcript of the interrogations preserved in the records of this case, as required under Texas law.[12]

In these statements, Soffar implicated his "running buddy" Latt Bloomfield as a co-participant with Soffar in the robbery/murder incidents at the bowling alley. According to these statements, Soffar and Bloomfield went to the bowling alley in Bloomfield's car and used Bloomfield's gun in the robbery/murders. Based on these statements, the Houston Police arrested Latt Bloomfield and placed him in a police line up for viewing by Greg Garner, the sole surviving victim of the shootings. Garner did not identify Bloomfield as being present at the bowling alley. In a similar fashion, the police placed Soffar in a line up for viewing

---

[12]*See* TEX. CODE CRIM. PROC. ANN. art. 3822 (1977); *see also **Alfaro v. Texas***, 638 SW.2d 891 (Tex. Crim. App. 1982).

by Garner and Garner did not identify Soffar as being at the bowling alley.

The police searched the apartment where Bloomfield lived and his car, but did not find a weapon of the caliber used to commit the shootings at the bowling alley. In fact, the police did not find any gun. And the police did not find any other object, cash or document, which could be identified as coming from the bowling alley. Similarly, while Soffar was in police custody, without counsel, the police searched his living quarters at home and found nothing that came from the bowling alley. The police finger printed both Soffar and Bloomfield, but their prints did not match any of the finger prints retrieved by the police from the murder scene at the bowling alley.

As a result of this investigation, the police determined that they had no basis to hold Bloomfield in connection with the robbery/murders, and they released him from police custody. Bloomfield has never been charged at any time with any criminal conduct of any kind relating to the robbery/murders at the bowling alley. The determination that there was no basis to hold Bloomfield obviously undermines the truthfulness of Soffar's statements.

Another aspect of this case that makes it unique and different, is the relationship between Soffar and Officer Bruce Clawson of the Galveston County Sheriff's Department. Prior to

Soffar's arrest, Clawson had been deploying Soffar as an undercover drug informant for developing leads and information about drug activities in Galveston County. This relationship provided numerous opportunities for Clawson to get to know Soffar's strengths and weaknesses, his mental limitations and emotional make-up, and how to manipulate him to get the information Clawson wanted developed. It is uncontradicted in the record that Clawson was summoned to the League City Courthouse when Soffar was arrested for motorcycle theft because the League City Police knew of the relationship between Soffar and Clawson, and that they expected Clawson to be of help in getting Soffar to open up to the police.

Clawson did not have any official duty, responsibility, task or involvement with the investigation of the bowling alley murders, which occurred in Harris County not Galveston County. The record also shows that Clawson negotiated with Soffar as to which police officer would be the interrogator about the bowling alley murders. Soffar did not want Officer Palmire (his old nemesis from Friendswood) to be the interrogator, and likewise, Soffar did not want Assistant District Attorney Wilson to be the interrogator.[13]

_____

[13]In footnote 4 of its opinion, the en banc majority cites a finding by the state habeas judge that Soffar's refusal to talk to these two officers "was not an invocation of the applicant's [Soffar's] right to remain silent." As to the fact of Soffar's refusal to talk to these two officers, the state habeas court is factually correct; but as to whether such refusals constituted an invocation of the right to remain silent, the state habeas court's determination is a conclusion of law, which does not bind this Court on review. Furthermore, that conclusion is irrelevant and immaterial to the critical determination of whether Soffar exercised his right to remain silent during his interrogation by Detective Schultz.

Clawson did get Soffar to agree to submit to interrogation by Detective Schultz. The bottom line is that this relationship produced what Clawson described as a one-way friendship. Soffar considered Clawson to be his friend, but Clawson did not consider Soffar to be his friend.

With this background in mind, I turn to consideration of the facts and law relating to three critical issues in this appeal:

    A.    Did Soffar exercise his constitutional right to remain silent; and if so, what are the consequences thereof?

    B.    Did Soffar exercise his constitutional right to get assistance from counsel, and if so, what are the consequences thereof?

    C.    Did Soffar make a knowing and informed waiver of his *Miranda* rights as a result of his dialogue with Clawson?

## A. Right to Remain Silent

As indicated earlier, Clawson arranged for Detective Schultz to interrogate Soffar about Soffar's knowledge of the bowling alley murders. This interrogation began with Soffar, Schultz, and Clawson in the interrogation room. There is some testimony by Schultz that he thought a legal stenographer was also in the room taking notes of the interrogation; but, if such a person were

-24-

there, the State was unable to locate any stenographic notes or any transcriptions as a result thereof, and no such person testified at the state habeas hearing to serving in that capacity. Likewise, it is clear that the interrogation by Schultz of Soffar was not recorded by any video tape recorder or any audio tape recorder. Clawson testified at the habeas hearing that in the beginning he remained in the room for about 15 minutes during which time Schultz was interrogating Soffar as to the physical premises at the bowling alley. From the difficulty that Soffar had in describing the premises, Clawson concluded that Soffar really didn't know much about the facts, and Clawson left the interrogation room, but remained at the League City Police Office. About 30 minutes later, Schultz came out of the interrogation room and told Clawson that he (Schultz) had hit a brick wall and that Clawson needed to go back into the room and get Soffar talking again.

## Discussion

Among the important safeguards established by *Miranda* is the "right to cut off questioning," **Miranda v. Arizona**, 384 U.S. 436, 474 (1966), which serves as an essential check on "the coercive pressures of the custodial setting" by enabling the suspect to "control the time at which questioning occurs, the subject discussed, and the duration of the interrogation." **Michigan v. Mosley**, 423 U.S. 96, 103-04 (1975). This right is a "critical

-25-

safeguard" of the Fifth Amendment privilege, *Mosley,* 423 U.S. at 103, and requires the police immediately to cease interrogating a suspect if he "indicates *in any manner, at any time...*during questioning, that he wishes to remain silent." *Miranda*, 384 U.S. at 473-74 (emphasis added); *Mosley,* 423 U.S. at 100-102.[14] "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice...." *Miranda*, 384 U.S. at 474. Here, by "refusing to talk" to Detective Schultz, Soffar invoked his constitutional right to remain silent. *Mosley*, 423 U.S. at 101-02 (defendant's indication that he did not want to answer questions invoked his right to cut off questioning).[15]

---

[14]The Supreme Court decision in *Davis* does not address in any way this *Miranda* right to remain silent. Moreover, Soffar's claim in this case that he invoked his right to remain silent does not depend on any arguably "ambiguous" statement, but on the facts and circumstances set forth in the state habeas findings and conceded by the state ("Detective Schultz came out of the interview room and told Bruce Clawson that he had hit a brick wall," State Court Findings, p.77, ¶8); Clawson's testimony ("...a detective came and told me Max was refusing to talk and asked me to see if I could get Max to talk again," Clawson Aff. ¶19), and his uncontroverted account of his session with Mr. Soffar; and the end result of Clawson's interview, the resumption of interrogation by Schultz, together with Clawson's candid assessment of that result ("All in all, I was used to getting Max to talk." Clawson Aff. ¶16).

[15]*Accord, Charles v. Smith*, 894 F.2d 718, 725-26 (5th Cir. 1990) (defendant's refusal to talk to police invoked his right to cut off questioning); *United States v. Hernandez*, 574 F.2d 1362, 1368-69 (5th Cir. 1978)(defendant's refusal to answer questions invoked his right to cut off questioning); *Nelson v. Falcomer*, 911 F.2d 928, 932-34 (3d Cir. 1990) (defendant's refusal to talk to police invoked his right to cut off questioning); *United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir. 1988) (defendant's silence and refusal to respond to police questioning invoked his right to cut off questioning); *Christopher v. Florida,* 824 F.2d 836, 840-41 (11th Cir. 1987)(defendant's refusal to talk to police invoked his right to cut off questioning); *United States v. Poole*, 794 F.2d 462, 465-67 (9th Cir. 1986) (defendant's statement that he had "nothing to

Once Soffar invoked his right to silence by refusing to talk, the police were under an absolute obligation to "scrupulously honor" the right to remain silent and to immediately cease all questioning. *Mosley*, 423 U.S. at 104. Here, Schultz did break off the interrogation by leaving the room, but he immediately violated Soffar's rights by sending in Clawson to override Soffar's exercise of his right. In doing so, the police failed to honor Soffar's right to remain silent, rendering inadmissible all statements subsequently obtained.

The State argues, and to my dismay the majority seems to be on the verge of adopting, the concept that a person must do something special to "invoke" his *Miranda* right to remain silent. This is sophistry beyond my ability to understand. What in the world must an individual do to exercise his constitutional right to remain silent beyond actually, in fact, remaining silent?

In my view, Detective Schultz failed to "scrupulously honor" Soffar's right to remain silent and violated *Miranda* by sending in another person to try to talk Soffar into resuming the dialogue.

---

talk about" invoked his right to cut off questioning); ***Martin v. Wainwright***, 770 F.2d 918, 922-24 (11th Cir. 1985) (defendant's statement "can't we wait until tomorrow" invoked his right to cut off questioning), *modified in respects not relevant*, 781 F.2d 185 (1986); ***Anderson v. Smith***, 751 F.2d 96, 101-05 (2d Cir. 1984) (defendant's refusal to talk to police invoked his right to cut off questioning); ***Robinson v. Percy***, 738 F.2d 214, 220 (7th Cir. 1984) (defendant's statement that he did not want to talk with the police invoked his right to cut off questioning); ***Watson v. State***, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988) (defendant's silence and refusal to answer questions during interrogation invoked his right to cut off questioning); ***Faulder v. State***, 611 S.W. 2d 630,640 (Tex. Crim. App. 1979) (*en banc*) (defendant's request that he be allowed time to get matters straight in his mind before answering questions invoked his right to cut off questioning); ***Hearne v. State***, 534 S.W. 2d 703, 706-07 (Tex. Crim. App. 1976) (defendant's refusal to talk to the interrogating officer invoked his right to cut off questioning).

This error was compounded by the fact that Clawson was the person sent in to get Soffar to resume talking -- his prior knowledge, experience, and contact with Soffar gave him an advantageous position from which to work on Soffar. *Spano v. New York*, 360 U.S. 315 (1959). Given the ability of interrogators to needle, tease, taunt, and repeat again and again, remaining silent in the thrust of such testing requires a genuine exercise of will power. Actions speak louder than words, and silence is "forbearance from speech," the result of not speaking. To create some sort of *magic password* that the majority seems to want to do, and require this *password* to be spoken in order to exercise the right to remain silent, will result, tragically, in the dilution of this most fundamental constitutional right, i.e. the right to require the government to prove guilt beyond a reasonable doubt without relying upon any words from the mouth of the accused.

## B.  Right to Counsel

The second critical issue in this appeal is whether Soffar exercised his constitutional right to assistance from counsel during his dialogue with Clawson and, if so, the consequences thereof. This issue necessarily involves an evaluation of the dialogue that occurred between Clawson and Soffar after Clawson went back into the interrogation room to get Soffar talking again, as requested by Detective Schultz. The record is clear that there

was no other person in the interrogation room except Soffar and Clawson; and again there was no video tape recording or audio tape recording made of this conversation. Clawson testified that his dialogue with Soffar lasted about 35 or 40 minutes. It is very troubling to me that the interrogation of Soffar did not include any form of live real time recording of the conversations. *See* TEX. CODE CRIM. PROC. ANN. art. 3822 (1977). Technology was obviously available to make recordings of these interrogations because the police investigators made audio tape recordings of each of the four interviews with Garner, the surviving victim, and then those recordings were transcribed verbatim in question and answer form and were in the prosecutors' files.[16] Obviously, if a recording in some form had been made of the dialogue between Clawson and Soffar, our tasks on appellate review would have been greatly simplified.[17]

---

[16]As already noted, a statute of the State of Texas that was in full force and effect at the time of Soffar's interrogations would have seemed to make the recording of oral interrogation of a suspect in police custody standard operating procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (1977). Why that procedure was followed in the case of Garner and not in the case of Soffar is one of the many puzzling enigmas in this case.

[17]The evil that *Miranda* addresses is the practice of police interrogation of a suspect in custody which occurs in a separate room, preferably without windows, by several police officers, over extended periods of time, the purpose of which is to put pressure on the suspect to talk by isolation, fear, fatigue, intimidation, vigorous cross-examination, and other techniques which have been developed and dissiminated to make such interrogations as effective as possible. Given the low cost and widespread availability of video taping equipment, a significant improvement in the application and enforcement of *Miranda* rights could be achieved, in my opinion, by a statute or court rule requiring (1) that all interrogations of a capital murder suspect must be video taped in real time with elapsed time shown on the tape; (2) that such tape must be preserved for a period of ten years after the interrogation; and (3) that if such interrogation was conducted without the presence of counsel for the suspect, such tape would be made available for viewing by such counsel immediately upon his employment or his appointment.

We are left, therefore, to evaluate both the factual and the legal content of this dialogue based on the testimony of Clawson as it was developed at the state habeas corpus hearing. The words that were spoken by each of the parties as described by Clawson are not in dispute, intimations of the majority opinion to the contrary not-withstanding. Because the specific language used takes on such critical importance, I turn now to a separate and individual discussion and evaluation of each of the questions and answers between Soffar and Clawson:

Question No. 1:

Soffar asked: "Should I get an attorney or talk to the detective?"

Clawson answered: "If [you were] involved in the crime, you should tell the detective [you were] in it; otherwise [you] should get a lawyer."

Commentary:

There is nothing in **Miranda** itself, nor in any of its progeny, which draws any distinction between guilty and innocent suspects as far as being entitled to the **Miranda** protections. The only requirement for the protections contemplated by **Miranda** is that the suspect be "in police custody," which Soffar clearly was in this case. Clawson's answer to this question is completely inaccurate, inappropriate, and inconsistent with his obligations under **Miranda**. I would suggest that a reasonable answer by a reasonable police officer would be:

You have a constitutional right to have a lawyer present

-30-

to help you during this interrogation whether you are guilty or innocent. On the other hand, you may talk to the police without a lawyer if you so choose. The choice is up to you and I can't make that choice for you; but if you want a lawyer, you need to clearly say so as otherwise the police may assume you don't want a lawyer.

Question No. 2:

Soffar asked: "How do I get a lawyer?"

Clawson answered: "Can you afford to hire a lawyer on your own?"

Commentary:

This answer is directly contrary to the language and spirit of *Miranda*. Clawson knew that Soffar didn't have enough money to hire his own lawyer when he gave this answer and, in my view, Clawson gave this answer not to inform Soffar but to put Soffar in a position of dependency as he had been as an undercover informant for Clawson. Therefore, Clawson's answer is totally non-responsive to the question asked by Soffar. In my view, a reasonable answer by a reasonable police officer would have been:

You can get a lawyer by hiring one of your own choice and agreeing to pay that lawyer's fees and expenses yourself. If you don't have enough money to pay for your own lawyer, you can sign an affidavit which says that; and the court will then appoint a lawyer to help you and the fees and expenses of this appointed lawyer will be paid for by the state.

Question No. 3.

Soffar asked: "When can I get a court-appointed lawyer?"

Clawson answered: "It could take as little as a day or as long as a month."

Commentary:

The "as long as a month" portion of Clawson's answer is just flat wrong and Clawson knew it.  Clawson gave this answer because he knew from his prior experience with Soffar that Soffar could not think about anything past tomorrow, and Clawson intended to discourage Soffar by this long time estimate.  Under *Miranda*, the length of time it may take to get counsel appointed is immaterial and irrelevant.  In my view, a reasonable answer by a reasonable police officer would have been:

> A day or two at the most, but you shouldn't worry about how long it takes because during that time you have a constitutional right to remain silent and this interrogation will cease until your lawyer is appointed and you've had a chance to talk with him in private.
>
> Question No. 4.
>
> Soffar asked:  "So you are saying that I have to deal with this on my own?"

Clawson answered "yes" at one point in the state habeas hearing transcript and "I did not answer at all" at another part in the state habeas transcript.

Commentary:

Neither of Clawson's answers are proper under *Miranda*.  The "yes" answer is just plain wrong and totally inconsistent with the whole purpose of the *Miranda* requirements.  If Clawson did not answer this question at all, Soffar would be left to make a decision based on an incorrect assumption and on a subject as to which he is not fully informed.  I would suggest that a reasonable officer would make the following reasonable answer to Soffar's

-32-

question:

> No, you don't have to deal with it on your own.  As I told you earlier, you have a constitutional right to get a lawyer to help you if that's what you want.

The majority would like to dispose of this claim by Soffar under the rubric that mere ambiguous comments by a suspect that just mention an attorney will not be deemed sufficient to constitute a request for help from an attorney.  I think the majority errs in applying that rubric to this case for three reasons.

First, from a pure language and grammar standpoint, there is nothing "ambiguous" at all about Soffar's questions.  They are each clear, unequivocable requests for information relevant and material to Soffar's making an intelligent and informed decision as to his desire for counsel.  All of the cases upon which the en banc majority relies to support its conclusion that each of the questions asked by Soffar did not constitute a sufficiently clear request for an attorney, were cases where there was one random unconnected comment by the suspect on the subject of counsel and not a series of specific questions relating to getting the help of counsel as we have here in *Soffar*.  In my view, there is a world of difference between one ambiguous comment and a specific request for information; and when you have to deal with a series of specific questions, the difference becomes even more critical.

Second, in each of the cases relied upon by the majority there

was clear, irrefutable, and conclusive evidence connecting the confessing suspect to the crime under investigation.  In such circumstances, it is understandable that a reviewing court would be reluctant to invalidate a conviction simply because of some random comment made by the suspect during his in-custody interrogation. It is inherent that the *Jackson v. Denno* review for compliance with *Miranda* requirements occurs after the circumstances of the interrogation itself and frequently after the suspect has already made inculpatory statements without the presence of counsel.  Here, the assertion as to non-compliance with *Miranda* was not seriously raised at the *Jackson v. Denno* hearing and was only brought to light as the result of discovering new information developed during the state habeas corpus hearing.  At that point, the fact that there was "no physical evidence linking Soffar to the crime" (as the majority characterizes the situation) was self-evident, and Soffar's conviction and death penalty hang by the thread of how the reviewing court interprets the Clawson/Soffar dialogue.

Third, I disagree with the majority's conclusion that, under *Davis*, Soffar did not make a sufficiently clear invocation of his right to counsel.  As stated earlier, I believe the facts presented here fall outside *Davis*' scope.  However, assuming *Davis* is applicable I believe an accurate reading of *Davis* has to be made now through the lenses of the Supreme Court decision in *Dickerson v. United States*, 530 U.S. 428 (2000).  While Soffar's case was on

-34-

appeal in our Court, the Supreme Court handed down its decision in *Dickerson*. It held "that *Miranda* announced a constitutional rule that Congress may not supersede legislatively" and that for reasons of stare decisis, the Court declined to overrule *Miranda* itself. *Dickerson*, 530 U.S. at 444. The en banc majority opinion here does not even recognize the existence of *Dickerson*.

Note that the Supreme Court in *Dickerson* used the past tense in stating that *Miranda* <u>announced</u> a constitutional rule and used the present tense in applying the rule of stare decisis as the reason for declining to overrule *Miranda*. I suggest, therefore, that the interpretation that should be drawn from *Dickerson* is that the rule announced in *Miranda* was in the beginning, is now today, and has always been in the interval a constitutional rule. In evaluating the strengths and applicability of *Davis* here in *Soffar*, we should recognize that the opinion in *Davis* is the "last of the Mohicans" of those opinions in which a majority of the Supreme Court characterized the *Miranda* rights as not being "required by the Fifth Amendment's prohibition on coerced confessions" and instead characterized *Miranda* and its progeny as being the product of the prophylactic rule making power of the Supreme Court. *See Davis*, 512 U.S. at 458. The decision of the Supreme Court in *Dickerson* has eliminated any meaning to this distinction.

Furthermore, in evaluating the strength and applicability of

*Davis*, I would point out the substantial differences in the factual

circumstances under which the issue of invocation of the right to

counsel took place in *Davis* from the circumstances involved here in

*Soffar*.  The following is a direct quote from the majority opinion

in *Davis*:

> About an hour and a half into the interview, petitioner
> [Davis] said "Maybe I should talk to a lawyer."
>
> According to the uncontradicted testimony of one of the
> interviewing agents, the interview then proceeded as
> follows:
>
> [We made] it very clear that we were not here to violate
> his rights, that if he wants a lawyer, then we will stop
> any kind of questioning with him, that we weren't going
> to pursue the matter unless we have it clarified whether
> he is asking for a lawyer or is just making a comment
> about a lawyer and he said "no, I'm not asking for a
> lawyer" and then he continued on and said "no, I don't
> want a lawyer."  After a short break the agents reminded
> petitioner of his rights to remain silent and to counsel.
> The interview then continued for another hour until
> petitioner said "I think I want a lawyer before I say
> anything else."  At that point, questioning ceased.

*Davis*, 512 U.S. at 455 (citations omitted).  Later on in the *Davis*

majority opinion, the Court states:

> Of course, when a suspect makes an ambiguous or equivocal
> statement, it will often be good police practice for the
> interviewing officers to clarify whether or not he
> actually wants an attorney.  That was the procedure
> followed by the NIS agents in this case [*Davis*].

*Id*. at 461.

The en banc majority opinion reads the language of *Davis* very

strictly and literally as requiring a suspect being interrogated by

police to expressly and explicitly say "I want a lawyer" in order

to validly assert his right to have counsel present, *regardless* of the dialogue and interchange of comments that might have actually occurred. In my view, the proper test as articulated by the Court in *Davis* is the following:

> Although a suspect need not speak with the discrimination of an Oxford don,... (Souter, J. concurring in judgment), he must articulate the desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

*Id*. at 459 (citation omitted). This objective test of what a reasonable police officer "would understand under the circumstances" would seem far more appropriate in protecting what *Dickerson* now clearly holds is a constitutional right. Additionally, the Supreme Court has in the past "given a broad, rather than a narrow interpretation" to requests for counsel, *see Michigan v. Jackson*, 475 U.S. 625, 633 (1986); *Connecticut v. Barrett,* 479 U.S. 523, 529 (1987); and has instructed that courts "indulge every reasonable presumption," *Johnson v. Serps*, 304 U.S. 458, 464 (1938); that a suspect has not waived his right to counsel under *Miranda*, *see, e.g., Oregan v. Bradshaw*, 462 U.S. 1039, 1051 (1983) (Powell, J. concurring) ("We are unanimous in agreeing that the [*Miranda*] right to counsel is a prime example of those rights requiring the special protection of the knowing and intelligent waiver standard.").

The reasonable officer test calls for a conclusion of law on

the part of the reviewing court as to whether the Soffar/Clawson dialogue constituted a sufficient invocation of Soffar's rights to counsel during the interrogation. In my own mind, I doubt that Officer Clawson could qualify as a reasonable police officer because he was charged with the mission of getting Soffar to resume talking to Officer Schultz; and Clawson knew that Soffar would say "yes" if he ever asked Soffar a clarifying question as to whether or not he wanted an attorney. So Clawson never followed the track suggested as good police practice by the Supreme Court in **Davis**; but, even so, he admitted in his state habeas testimony that he understood Soffar's questions to indicate that Soffar wanted a lawyer.

The Supreme Court decision in **Dickerson** did not establish a "new rule" and is thus fully applicable to this case. Significantly, it confirmed the continuing vitality of **Miranda**, and thus made clear that, because its prescription is a *constitutional requirement*, **Miranda**'s protections cannot be diluted, much less negated. **Dickerson** reiterated that **Miranda** was intended to curb precisely the kind of oppressive and overbearing interrogation tactics that produced the statements at issue here. As Chief Justice Rehnquist declared for the Court: "After discussing the 'compelling pressures' inherent in custodial police interrogation, the **Miranda** court concluded that, '[i]n order to combat these pressures and to permit a full opportunity to exercise the

-38-

privilege against self-incrimination, the accused must be adequately and effectively appraised of his rights *and the exercise of those rights must be fully honored*.'" **Dickerson**, 530 U.S. 440 (emphasis added).

The en banc majority relies heavily upon the state habeas court's finding that Clawson believed that Soffar had not "invoked his right" to an attorney as *determinative* of the legal issue presented. However, a police officer's "belief" (even if honestly held) regarding a relevant *legal* issue -- whether Soffar invoked his constitutional right to counsel -- simply cannot be dispositive of that issue. Under 28 U.S.C. § 2254 (pre-AEDPA), federal courts "have an independent obligation to say what the law is," **Williams v. Taylor**, 529 U.S. 362, 384 (2000) (opinion of Justice O'Connor for the Court) (quoting **Wright v. West**, 505 U.S. 277, 305 (1992)). Thus, the legal opinion of the interrogating police officer is subject to *de novo* federal court review just like that of a state court. Clawson's acknowledgment that, at the time in question, he *did* understand that Soffar was telling him that he wanted an attorney is the definitive historical fact, and conclusively shows that Soffar *did* invoke his right to counsel. Because Clawson knew that Soffar wanted an attorney, the police were prohibited from interrogating him until counsel was present. **Miranda**, 384 U.S. at 473-74 (1966); **Edwards v. Arizona**, 451 U.S. 477, 485 (1981); **Arizona v. Roberson**, 486 U.S. 675 (1988). Because they failed to

-39-

"scrupulously honor" this right, the statements Soffar signed should be suppressed.

### C.   Knowing and Informed Waiver

The *Miranda* decision imposes more than a mere requirement that warnings be provided at the beginning of an interrogation.  The warnings were intended to secure what the Court made clear was the basic requirement to "assure a *continuous opportunity* [to a suspect] to exercise" his rights at any point during an interrogation.  384 U.S. at 444 (emphasis added).  By elevating form over substance, the en banc majority has lost sight of the purpose underlying the *Miranda* warnings.  The police must not only dispel, at the outset, the coercive atmosphere that is inherent in the surroundings of custodial interrogation; they must also ensure that it does not return.  384 U.S. at 445-58.

The en banc majority believes that Officer Clawson's dubious statements could not have nullified Soffar's waiver of his *Miranda* rights, because Soffar had *already* waived them by the time Officer Clawson started his fateful interrogation and provided his "misleading answers" to Soffar's questions about his right to counsel.[18]  The Supreme Court specifically rejected this analysis:

---

[18]The fact that confessions made under coercive circumstances are often, as in this case, accompanied by explicit "waivers" of rights or statements that "no threats or promises" were made cannot signify the end of a court's inquiry.  "Common sense dictates ...that if the authorities were successful in compelling the totally incriminating confession of guilt," the same authorities would have

"Our aim is to assure that the individual's right to choose between silence and speech *remains unfettered throughout the interrogation process*." *Miranda*, 384 U.S. at 469 (emphasis added). The Court pointed out that a one-time warning, delivered at the outset "by those who will conduct the interrogation, cannot itself suffice to that end...." *Id*.[19] To emphasize this point, the Court added, "there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking" his rights. 384 U.S. at 475-76. Finally, and of direct relevance here, the Court stated that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive" his constitutional rights. *Id*. at 476.

This absolute proscription of threats, trickery, and deceit in connection with waivers of constitutional rights, at any time "throughout the interrogation process" was by no means a new concept introduced in *Miranda*. Prior to *Miranda*, the Supreme Court had made clear that the use of such tactics would result in the invalidation of any purported waiver of constitutional rights and a finding that any statement given had been coerced. For example,

"little, if any, trouble" obtaining a written "concession of voluntariness" and waiver of any rights. *Haynes v. Washington*, 373 U.S. 503, 513 (1963).

[19]Thus, the en banc majority's observation that Soffar was "read his *Miranda* rights at least *four* times," is not dispositive. What matters is what the police did when it counted -- when Soffar inquired as to the content of his rights.

in *Spano* a police officer who the defendant believed was a friend overcame his desire not to talk to the police by lying to him, telling him that "his job was in jeopardy" because of the suspect's unwillingness to talk, and that "the loss of his job would be disastrous to his three children, his wife and his unborn child." *Spano*, 360 U.S. at 323. The Court held that Spano's "will was overborne" by "sympathy falsely aroused," and that, accordingly, his subsequent statement was involuntary. *Id*. As the Court has pointed out, it has held that "affirmative misrepresentations by the police [are] sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege," *Colorado v. Spring*, 479 U.S. 564, 576, n.8 (1987), and has precluded statements given when a "waiver" was obtained after threats, trickery or deceit were employed.[20]

The Supreme Court has set a high standard of proof for the waiver of constitutional rights, pursuant to which courts should

---

[20]Thus, in *Smith v. Illinois*, 469 U.S. 91, 98 and n.8 (1984), the Court found that a police officer's statement ("You either have to talk to me this time without a lawyer being present and if you do agree to talk with me without a lawyer being present you can stop at any time you want to") constituted "overreaching" and "badgering," and it approved the Illinois Supreme Court dissent's statement that the officer's statement was "seriously misleading" because it "imparted" to the suspect that "he had to talk to the interrogator." *See also*, *Edwards*, 451 U.S. at 479 (suspect was advised that "he had" to talk to police); *Rogers v. Richmond*, 365 U.S. 534, 538, 542 (1961) (police overcame refusal to talk by threatening "to take his wife and foster children into custody," despite lack of probable cause for, or intention to take, such action; the Court rejected the state's argument that "artifice or deception" in getting a waiver is permitted if it is not likely to affect the "reliability" of a confession); *Lynumn v. Illinois*, 372 U.S. 528 (1963) (police overcame refusal to talk by telling suspect that, if she did not 'cooperate,' her children would be taken from her); *Leyra v. Denno*, 347 U.S. 556 (1954) (psychiatrist with knowledge of hypnosis, introduced to suspect as "doctor" who would provide relief from painful sinus, overcame refusal to talk and obtained confession).

"'indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great" to demonstrate a valid waiver. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). "Doubts must be resolved in favor of protecting the constitutional claim." *Michigan v. Jackson*, 475 U.S. 625, 633 (1986). The mere fact that a suspect spoke to the police is no evidence at all that he knowingly and intelligently waived his right against self-incrimination. *Tague v. Louisiana*, 444 U.S. 469, 470-71 (1980). To the contrary, where "the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475.

### III.  Due Process Voluntariness

Finally, I want to register my disagreement with the en banc majority because they ignore completely and fail to address another theory upon which I believe Soffar has established his right to habeas corpus relief. That theory is the Supreme Court's long-established "due process voluntariness" test. This test is summarized in the Supreme Court decision in *Miller v. Finton*, 474

-43-

U.S. 104, 109-10 (1985),[21] wherein the Court stated:

> The Court's analysis has consistently been animated by the view that tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness.

In over 30 different decisions, the Supreme Court refined this test into an inquiry that examines "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession, *Schmitoff v. Bustamonte*, 412 U.S. 218, 223 (1973); and by indicating that the due process test takes into consideration "the totality of the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation," *id.*; and by specifying that the due process test is determined by "a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Stein v. New York*, 346 U.S. 156, 185 (1953). The continued viability of this due process test of involuntariness was affirmed again by the Supreme Court in *Dickerson*, where the Court stated:

> We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.

530 U.S. at 434. Furthermore, in *Dickerson*, the Supreme Court stated:

> The requirement that *Miranda* warnings be given does

---

[21]Obviously this decision was "on the legal landscape" at the time Soffar's conviction became final in 1989.

> not of course, dispense with the voluntariness inquiry but as we said in **Berkimer v. McCarty**, 468 U.S. 420, 104 S. Ct. 3138 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of **Miranda** are rare." **Id**. at 433 n.20.

**Dickerson**, 120 S. Ct. at 2336.

With all due respect, I suggest to my colleagues in the en banc majority that Soffar's case is one of "those rare cases" in which a self-incriminating statement was compelled despite the fact that the law enforcement authorities attempted to adhere to the dictates of **Miranda**; but this is not the first time that our Court has been called upon to address one of these "rare" cases. In **Jurek v. Estelle**, 623 F.2d 929 (5th Cir. 1980),[22] Judge Reynaldo Garza, writing for the en banc majority, held that after a full review of all of the facts and circumstances, the second of two written confessions that Jurek signed was the result of "factors suggesting an inescapable conclusion that the confession was involuntary." **Id**. at 942. In footnote 7 of his majority opinion, Judge Garza stated:

> The precise holding of this opinion, based on an analysis of the cumulative impact of these factors, is no more or less than the following: Where a (1) mentally deficient accused, who was (2) functionally isolated from all but his interrogators (3) who was not assisted by counsel

---

[22]The opinion in **Jurek** was issued on August 10, 1980, just three days after Soffar was charged in this case; and would obviously be "on the legal landscape" at the time Soffar's conviction became final in 1989.

(4) and who had executed a valid confession to murder, essentially solving the crime under investigation was (5) the subject of continuing purposeful and suggestive interrogation directed (6) toward an amendment of his earlier confession to include information so minimally suggested as to amount to a prosecutorial "hunch," the renewed interrogation producing (7) a confession which is facially suspect and which (8) achieves the precise result sought by the prosecutors, (9) enhancing in a manner unknown to the accused the potential penalty to that of death, a consideration which would cause any person made aware of it to pause and carefully consider the truthfulness of any additional information suggested, the risk of involuntariness is so great that the confession cannot be admitted in consistency with due process guarantees and the privilege against self-incrimination.

623 F.2d 941 n.7.

In concluding his en banc majority opinion in *Jurek*, Judge Garza stated:

We are mindful of Justice Frankfurter's admonition that the conviction is "basic to our legal order, that men are not to be exploited for the information necessary to condemn them before the law [and] that, in Hawkin's words, a prisoner is not to be made the deluded instrument of his own conviction." *Culombe v. Connecticut*, 367 U.S. at 581, 81 S. Ct. at 1867. We are also mindful of the necessities and difficulties of effective law enforcement, in which the confession may be an essential and fair device for the protection of the public. We have found that in their efforts to secure such protection by insuring that Jurek was condemned, the law enforcement authorities ran far too high a risk of making him the deluded instrument of his own execution.

623 F.2d at 942.

I am disappointed that the en banc majority here in *Soffar* was either unable or unwilling to see the obvious similarities between

-46-

***Soffar*** and ***Jurek***.  Both Jurek and Soffar were, at the time of arrest, in their early twenties; neither remained in school past the seventh grade and both had difficulty holding any kind of job. The record in ***Soffar*** is overflowing with testimony that Soffar was "mentally deficient" just like Jurek.  The record is uncontested that Soffar was "functionally isolated from all but his interrogators" for almost three days -- a longer period of time than Jurek was.  The record is explicit that Soffar did not have the assistance of counsel until after he signed his third statement.  The third statement was the one presented to the jury at Soffar's trial, like Jurek's second statement.  Like Jurek's two statements, Soffar's three different statements were factually and grammatically different.  Finally, in ***Jurek***, as in ***Soffar***, there was controversy about whether or not the suspect in custody effectively asked for assistance of counsel.  In ***Jurek***, however, there was clear evidence in the record that the interrogators made further inquiry of Jurek to clarify his wishes and he expressly declined the assistance of counsel.  Even so, the circumstance of Jurek's lack of assistance of counsel was a factor considered in making the judgment on the voluntariness of his confessions.

In addition to these similarities with ***Jurek***, there are certain special circumstances that occurred in ***Soffar***, which must be considered in a "due process voluntariness" analysis. First, in between Soffar's signing of his first statement and of his second

-47-

statement, Soffar was taken to a line-up arranged for viewing by the surviving witness, Greg Garner. Garner failed to identify Soffar as the perpetrator of the robbery/murders. Obviously, Soffar did not have the benefit of any counsel being present at this line-up and the record does not indicate that the detectives conducting this line-up advised Soffar that Garner had failed to identify him. Second, after Soffar signed his second statement but before he signed the third statement, two other significant events occurred: (i) the interrogating detectives released Latt Bloomfield from custody because "they did not have enough evidence to either hold or charge Bloomfield"; and (ii) the arresting detectives filed felony capital murder charges against Soffar alleging that he intentionally caused the death of one of the victims while in the course of committing or attempting to commit armed robbery. Upon the filing of these formal charges, surely due process would mandate that the detectives promptly present Soffar before a magistrate judge for the purpose of apprising him of these new formal charges and for the purpose of determining his need for counsel.[23] But instead of presenting Soffar before a magistrate judge for arraignment on the murder charge, the interrogating detectives continued their interrogation and, later that same evening, Soffar signed the third statement. Soffar's first two statements respecting the offense indicated that his role was

---

[23]*See* TEX. CODE CRIM. PROC. ANN. art. 14.06.

limited to being the driver of the get-away car. The third statement was a far more incriminating version of purported "events" in which Soffar implicated himself in the actual shootings.

Given all of these circumstances, I come easily to the same conclusion that Judge Reynaldo Garza reached in *Jurek*; in their efforts to secure protection of the public by ensuring that Soffar was condemned, the law enforcement officers ran too high a risk of making him the deluded instrument of his own execution.

## CONCLUSION

I know the record in this case as well as any other Judge who has ever addressed it and better than most of the Judges on this Court. I wrote the panel opinion, *see* 237 F.3d 411, to provide a comprehensive overview of the history of this case because I was convinced that this is one of those special, unique and peculiar cases which demands a consideration of the totality of the circumstances in order to reach a just result. I have laid awake nights agonizing over the enigmas, contradictions, and ambiguities which are inherent in this record. However, my colleagues in the en banc majority have shut their eyes to the big picture and have persuaded themselves that piecemeal justice is sufficient in this case. That is, of course, their privilege but I am glad I will not be standing in their shoes, if and when Soffar is executed solely

because of the third statement he signed in this case.