Judgment rendered August 14, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 992,
La. C. Cr. P.

No. 52,762-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

RAYMOND GEORGE JOHNSON                       Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 348882

Honorable Katherine Clark Dorroh, Judge

* * * * *

LOUISIANA APPELLATE PROJECT              Counsel for Appellant
By: Peggy J. Sullivan

RAYMOND GEORGE JOHNSON                   Pro Se

JAMES EDWARD STEWART, SR.                Counsel for Appellee
District Attorney

JASON WAYNE WALTMAN
WILLIAM JACOB EDWARDS
CHARLES KENNETH PARR
Assistant District Attorneys

* * * * *

Before COX, McCALLUM, and THOMPSON, JJ.

**McCALLUM, J.**

Raymond Johnson appeals his conviction of second degree murder for the stabbing death of his on-again, off-again girlfriend, Yolanda Moore.[1] We affirm his conviction and sentence.

## FACTS

At approximately 5:44 a.m. on April 29, 2017, Raymond Johnson placed a 911 call from his cell phone to report that a female friend had cut him as well as herself at his home in Shreveport. He requested medical attention and told the 911 operator that his friend "was laying out on the floor."

Shreveport Fire Department ("SFD") and Shreveport Police Department ("SPD") personnel arrived at Johnson's home at 5:52 a.m. Three minutes later, paramedics confirmed that Moore was dead. Moore was 44 years old at the time.

The emergency responders immediately encountered the bloody aftermath of a violent episode. Moore, wearing only unzipped jeans which were not completely pulled up, was on her back atop a sheet on the dining room floor. Many wounds were visible on her body, and a fan was positioned to blow on it. Furniture was overturned in the dining room, the adjoining living room, and a bedroom.[2] Blood, whether in the form of a drop, pool, or smear, was present throughout the house, as well as on a neighbor's porch and on the interior and exterior of Johnson's car, which

---

[1] Throughout this opinion the victim is referred to simply as "Moore." While this practice might appear brusque, it is done for purposes of clarity and accuracy due to the number of individuals referenced in this lengthy opinion.

[2] Although referred to separately, the dining room and the living room were essentially one large room across the front of the house that was separated by only a small built-in cabinet that extended from one wall. There was a recliner, chair, and sofa in the dining room. The furniture in the living room included a recliner and two sofas.

was parked in his driveway. A bloody knife was recovered from the front yard of Johnson's home. When the emergency responders arrived they found Moore's lifeless body, Johnson, and no other individuals present.

Subsequently, Johnson was indicted for the second degree murder of Moore in violation of La. R.S. 14:30.1. The State filed multiple notices of its intent to use other crimes evidence against Johnson. These prior incidents involved domestic abuse against Moore and another former girlfriend, as well as violence against a friend of Moore's. The trial court found the majority of this evidence to be admissible.

Johnson filed a motion to suppress statements made to detectives during custodial interrogation. Johnson contended that the detectives continued with his interrogation despite his request for a lawyer. The motion was denied and the matter proceeded to trial by jury.

*Trial*

Cassandra Pipkins, who lived next door to Johnson, testified that she was awakened early on the morning of April 29 by knocking on her door. Johnson, who was naked, asked Pipkins for a sheet. Pipkins did not consider Johnson's request unusual because he often had female companions at his home, and she surmised that one had run him out of the house. Pipkins was unsure of the time when Johnson came to her door, but knew she had gone to sleep at 2:20 a.m. Johnson ran back to his house after she gave him the sheet.

The State introduced a record of Johnson's cell phone calls which revealed that a call had been made from Johnson's phone to Moore's phone at 7:29 p.m. on April 28. A call was made from Johnson's phone to a "Sir Dar. Pete" at 5:33 a.m. on April 29. This call lasted six seconds. At 5:35

2

a.m., a call was made from Johnson's phone to a "Ronnie." This called lasted six minutes and 31 seconds. The 911 call followed at 5:44 a.m.

Answering the 911 operator's instructions, Johnson checked Moore for breathing and responded that he heard wheezing, which he described as like a "snoring" sound. He reported cuts to her chest caused by her falling onto a glass table. He then told the operator that he believed Moore was breathing.

SPD Corporals Rodney Medlin and Michael Schulz were the first emergency responders to enter Johnson's home. Schulz found Johnson straddling Moore with his hands around her shoulders. Moore's body was located in the dining room, approximately 15 feet from the home's front door. Moore was on a sheet that Pipkins recognized as the one she had given to clothe Johnson. Medlin recalled that Moore was nonresponsive and cool to the touch and felt it was immediately apparent that she was dead.

Medlin described the condition of several rooms as indicating that a struggle had taken place. In the living room, two couches were flipped over, a glass-topped table had been turned over, and what looked to be blood splatter was on the walls. Dressers were turned over in the master bedroom, and there appeared to be blood on the mattress, floor, and walls in that bedroom. Medlin also observed what he thought was blood on the mattress, floors, and in the hallway of a second bedroom.

Once the police officers could ensure their safety, paramedics entered the home. Chris Henry is a fire engineer with SFD. Examining Moore for signs of life, Henry found that she was cool to the touch and that her body was showing signs of rigor mortis and dependent lividity.

3

Henry noted a pool of what appeared to be blood on the porch, and that some of it was wet. Henry thought it was peculiar that while furniture was overturned in the living room, electronic equipment was untouched. Henry also thought it was strange that Moore's head was on a pillow and that she had a fan at her feet.

Captain Jackie Hutchinson of SFD arrived on the scene with Henry. She found Moore to be without respiration or a pulse. Hutchinson noted that Moore was cold to the touch and had several injuries to her chest that were incompatible with life. Hutchinson, who was a paramedic for 21 years and an emergency room nurse for 13 years, explained to the jury that rigor mortis is the sign of a death that had occurred more than one to two hours earlier. She also explained that dependent lividity takes one to two hours after death, if not longer, to occur. Hutchinson thought this case was different from most other calls that she had responded to because Johnson was walking around bleeding, Moore's wounds had stopped bleeding, and there was blood outside.

After Johnson was handcuffed, Schulz walked Johnson to his patrol vehicle for questioning and to read the *Miranda* rights to him. Schulz recalled that Johnson stated that he and Moore began arguing that morning because Johnson had to go to work. When Moore began throwing things, a struggle started and they fell through a glass table. Schulz testified that while Johnson was being treated by paramedics, he changed his story to say only Moore fell through the table. Schulz noticed a coffee table with a glass top in the living room, but the glass was cracked and not shattered.

Schulz noted that Johnson had lacerations on his forehead and a couple of them on his neck, and that some of the wounds were actively

4

bleeding. Schulz testified that Johnson never told him that Moore cut him with a knife or another object.

Jarvis Johnson, a fire engineer with SFD, arrived at the scene in an ambulance. He placed the defendant in the ambulance to examine him. Johnson discovered that the defendant had some lacerations to his arm and one to his forehead; most of these were superficial and were fresh, and the defendant's skin was still moist in the area of the lacerations. Johnson explained that the defendant's lacerations had not hardened, which is a process that usually begins 20-30 minutes after lacerations occur. Johnson transported the defendant to the hospital for treatment.

On the afternoon of April 29, Johnson was brought from the hospital to the office of SPD's violent crimes unit to be questioned by Detectives Logan McDonald and Adam McEntee. They met with Johnson at 2:45 p.m. A recording of the interrogation was played for the jury.[3]

Johnson was dressed in scrubs from the hospital and his head was bandaged. He was also handcuffed. McDonald did not have Johnson sign an acknowledgment card after being read his *Miranda* rights because his hands were bloody and because the interview was being recorded.

Johnson expressed shock when the detectives told him that Moore had died. He later uttered during the questioning that he thought a "corporal" at the hospital was joking when this officer told him that Moore was dead. However, McEntee reminded Johnson that he was the one who informed Johnson at the hospital of Moore's death. McEntee testified that when he

---

[3] Jurors did not hear the portion of the interrogation when Johnson discussed his prior criminal history.

5

told Johnson at the hospital of Moore's death, Johnson did not have much of a reaction other than to show a little surprise.

Johnson told the detectives that he was getting ready for work that morning when Moore, who had been drinking, started a fight with him.[4] Johnson asserted that Moore had a history of becoming violent when she drank alcohol. According to Johnson, Moore began wrecking his house by knocking over furniture. He asserted that she cut him as she chased him through his house, and that he bled as he ran. Johnson continued that as he tried to leave the house, Moore grabbed him by the testicles, so he pushed her off and picked up a sheet before leaving the house.

Johnson recounted to the detectives that as he spoke with his neighbor, Moore came onto Johnson's porch and sat on a chair. When the neighbor remarked that Moore had fallen down, Johnson ran back to his home, picked Moore up, and brought her into the house. Johnson insisted throughout the questioning that he did not know how Moore sustained her injuries. He contended that he only saw abrasions on her front when he picked her up off the porch after Johnson had fallen face first. Johnson attempted to explain to the detectives that the reason he told the officers earlier that Moore had been cut by glass from the table was because he had pushed her in that direction.

Early in the interrogation, Johnson told the detectives that he did not know what Moore used to cut him. However, later during the interview, he stated that she had used a knife. Johnson also explained that he called a

---

[4] Johnson stated that he needed to be at work at 6:00 a.m.

6

friend to tell him that Moore had passed out, and the friend recommended that Johnson call 911.

Corporal Marcus Mitchell is with SPD's crime scene investigations unit. Mitchell described the living room and the master bedroom in Johnson's home as looking like a tornado had gone through them. He noted that the master bedroom was in a state of disarray, and he described the mattress there as being heavily stained with blood.

Mitchell testified that Johnson had a wound to the top of his forehead, several injuries to his right shoulder, and an injury to his arm. He further stated that Johnson's hands appeared to be stained with blood. Mitchell did not note any injuries to Johnson's groin area or recall any significant injuries to his feet.

The bloody kitchen knife, found in the yard, had a three-inch blade. The knife was measured, from the tip of its blade to the tip of its handle, as being approximately eight inches in length.

Dr. Jessica Esparza, the DNA technical leader at the North Louisiana Crime Lab, testified about the results of DNA testing on samples taken from blood evidence at the crime scene. Johnson's DNA sample was consistent with the DNA collected in swabs taken from blood atop a hard drive and from blood on the kitchen floor, the kitchen sink, the bathroom wall, and a beer can in the refrigerator in Johnson's home. His DNA sample was also consistent with the DNA taken from blood found on Perkins's porch.

Moore's DNA sample was consistent with the swabs of DNA taken from blood on the mattress in the guest bedroom, the hallway wall adjacent to the master bedroom, the cracked television screen in the master bedroom, and the passenger seat armrest of Johnson's sedan.

7

Swabs of DNA taken from blood on the handle of the knife found in Johnson's yard, the door handle of the refrigerator in Johnson's kitchen, a beer can atop the refrigerator, and from the A-frame on the passenger side of Johnson's car were consistent with the DNA samples from both Johnson and Moore.

A swab of DNA collected from a drop of blood on the fireplace mantel in the living room of Johnson's home was consistent with Johnson's DNA. A swab of DNA collected from another blood spot on the same mantel was a mixture of DNA from two people. Moore and Johnson could not be excluded as donors.

Blood found on Johnson's bathroom sink, on the mattress in his master bedroom, and on the blade of the knife found in his yard contained a mixture of DNA from two people. Johnson and Moore could not be excluded as donors of that DNA.

Dr. James Traylor, a forensic pathologist, performed the autopsy on Moore. He counted 21 stab wounds, three of which, individually or collectively, could have caused her death.[5] Dr. Traylor testified that the stab wounds were caused by a single-edge knife.

Dr. Traylor explained that one fatal wound was on the upper left chest just below the collarbone, with the blade cutting the left subclavian artery. A second fatal wound was on the right side of the upper chest near the midline, with the blade puncturing the upper lobe of the right lung. The third fatal wound was on the left chest wall, with the blade puncturing the lower lobe of the left lung. Dr. Traylor explained that the wounds were fatal

_____

[5] Dr. Traylor characterized a stab wound as being a wound that measured deeper than it is long or wide at the skin surface.

8

not only because of blood loss, but also because Moore lost her ability to breathe once air and blood entered the pleural space.

Moore sustained nonfatal stab wounds to her left arm, back, neck, and left buttock. Dr. Traylor also noted that Moore sustained abrasions, contusions, and incised wounds. She had a contusion and an abrasion on one forearm, contusions on the right knee, and contusions on both lower legs. Dr. Traylor also found signs of a blunt force injury to the temple area near her left eye, as well as defensive wounds to both of her hands.

The depth of Moore's stab wounds ranged from 0.3 centimeters on the left breast to 10.5 centimeters on the left buttock. Dr. Traylor did not think that her stab wounds were consistent with falling into something made of glass. Rather, he believed that the stab wounds were consistent with the knife seized from Johnson's yard. The deepest penetration, to the left buttock, measured slightly longer than the blade length of the knife seized. Dr. Traylor explained that a blade can make a wound a little deeper than the blade length if the blade goes in at an angle. He further explained that buttock fat is deformable, which allowed the blade to go in a little deeper just by the knife pushing down into the fat. While Dr. Traylor could not say for certain that Moore's incised wounds were caused by the knife in question, he insisted they were caused by a sharp object.

Dr. Traylor believed that it would have taken Moore several minutes to die from her wounds. He thought Hutchinson's assessment that Moore had been dead for one to two hours before paramedics arrived was pretty accurate. Dr. Traylor concluded that it was fair to say that Moore had been dead for one to three hours based on the report of her body being cool to the touch, her recognizable lividity, and the early stiffening of her jaw.

Moore's blood alcohol content measured 0.203, and she had Benadryl, marijuana, and nicotine in her blood at the time of death. Dr. Traylor estimated that Moore had smoked marijuana within an hour of her death.

As noted earlier in this opinion, the trial judge allowed some testimony about Johnson's past treatment of Moore and a former girlfriend. Reginald Fleming, who had been in a relationship with Moore, recounted how Johnson had called Moore one night in April of 2017 when she was at Fleming's house. He heard Johnson tell Moore that time was short. Fleming added that he believed that Johnson was upset with Moore for being with Fleming at that moment.

Denise Taylor, who is Johnson's cousin, worked with Moore and considered her to be a close friend. She testified about an incident which occurred at Taylor's home in the summer of 2000. Taylor recalled that Moore was in an upset emotional state when Moore came to Taylor's house. Johnson later came to Taylor's house. Despite Johnson's insistence that he only wanted to talk to Moore, he pushed Moore back onto a couch after the pair began arguing. Taylor positioned herself between them and told Moore to head to the bedroom. Taylor recalled that Johnson threw an ashtray at Moore, barely missing her. Johnson then proceeded to the bedroom, where he pushed Moore down, hit her with his fists, and kicked her in the side. When Taylor again intervened, Johnson pushed Taylor and told her that he would "get [her] too" if she called the police.

Taylor also recalled an injury that Moore sustained after Moore had returned to her own home following a stay at Taylor's home. Taylor was called after Moore had gone to another friend's home for her safety. Upon meeting up with Moore, Taylor saw that the side of Moore's face was

10

swollen, even though her face had been in normal condition when she had left Taylor's house. Moore refused medical treatment.

Dana Randle had an on-again, off-again relationship with Johnson from 1981 until 2002. Johnson is the father of Randle's three adult children. Randle told the jury that Johnson had hit her in the face, grabbed her by the hair, and had burned her on the side of the face with a cigarette. Randle also testified that she and Johnson would fight when she declined to go out with him or if she wanted to leave somewhere before he did. Randle described how Johnson once stabbed her in the shoulder with a pen knife when she attempted to leave their home.

Randle detailed other violent incidents. On one occasion, they began fighting after Randle did not comply with Johnson's request to leave with him. Randle's brother had to pull Johnson off of her that time. Johnson hit her once during the fight as she wielded a knife to keep Johnson at bay. On another occasion, while she and Johnson were staying at the Lakeshore Inn in Shreveport, Johnson hit Randle when she attempted to leave. Randle did not come home one night when she and Johnson were living together. Upon returning home the next morning, Johnson hit her in the face and split her left jaw.

Randle testified that she was dating the late Gregory Mims in January of 1999. As she and Mims were walking to their apartment, Johnson pulled alongside in his car and tried to get Randle to leave with him. When she declined, Johnson pushed her, kicked her, and hit her in the head.

Randle recalled an incident in 2004 when Johnson asked Randle to give him money and to leave with him. They began fighting when she refused. Johnson hit her with a broom and tried to pull her from her house.

11

Randle, who was armed with a knife because she anticipated a fight, cut Johnson across the nose.

*Verdict and appeal*

Johnson was convicted as charged by the jury. He filed a motion for a post-verdict judgment of acquittal, which the trial court denied. Johnson was sentenced to the mandatory term of life imprisonment at hard labor without benefits. This appeal followed.

**DISCUSSION**

Johnson's appeal counsel contends: (1) the evidence was insufficient to prove that Johnson committed second degree murder, and the trial judge erred in denying the motion for a post-verdict judgment of acquittal; (2) the trial judge erred in allowing the State to introduce evidence of other crimes and acts by Johnson; and (3) the trial judge erred in denying the motion to suppress despite Johnson unequivocally requesting an attorney at the onset of questioning by detectives investigating the homicide.

Additionally, Johnson has filed a *pro se* appeal brief in which he asserts that the evidence was insufficient to convict him of second degree murder.

*Sufficiency of the evidence*

Johnson's appeal counsel maintains that Johnson acted in self-defense, arguing that he had the right to defend himself from an attack in his own home. She argues that the State failed to meet its burden that Johnson was not acting in self-defense when he stabbed Moore. In support of this argument, she notes: (1) Moore had a high blood alcohol level; (2) Moore had smoked marijuana within an hour of her death; (3) a struggle had occurred as was evident by the condition of the house; and (4) Johnson

12

sustained injuries consistent with defensive actions. His counsel additionally maintains that if Johnson was criminally culpable for Moore's death, then he was guilty of manslaughter and not second degree murder.

Johnson asserts in his *pro se* brief that Moore's emotional state was irrational and her functioning was impaired because of her "highly intoxicated" condition. He contends that he was in imminent fear for his life when Moore attacked him in his own home.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 2001-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Carter*, 42,894 (La. App. 2 Cir. 1/9/08), 974 So. 2d 181, *writ denied*, 2008-0499 (La. 11/14/08), 996 So. 2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 2005-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 2009-0310 (La. 11/6/09), 21 So. 3d 297.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct

13

evidence and inferred from the circumstantial evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Robinson*, 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717, *writ denied*, 2016-1479 (La. 5/19/17), 221 So. 3d 78.

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Mingo*, 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 2017-1894 (La. 6/1/18), 243 So. 3d 1064. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Mingo*, *supra*. The appellate court reviews the evidence in the light most favorable to the prosecution and determines whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 2007-2306 (La. 1/21/09), 1 So. 3d 417; *State v. Garner*, 45,474 (La. App. 2 Cir. 8/18/10), 47 So. 3d 584.

An appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 1994-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court accords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Casaday*, 49,679 (La. App. 2 Cir. 2/27/15), 162 So. 3d 578, *writ denied*, 2015-0607 (La. 2/5/16), 186 So. 3d 1162.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the

witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Crossley*, 48,149 (La. App. 2 Cir. 6/26/13), 117 So. 3d 585, *writ denied*, 2013-1798 (La. 2/14/14), 132 So. 3d 410. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Johnson*, 47,913 (La. App. 2 Cir. 4/10/13), 113 So. 3d 1209.

La. R.S. 14:30.1(A)(1) defines second degree murder as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.

A justifiable homicide committed in self-defense is recognized in La. R.S. 14:20, which states, in relevant parts:

> A. A homicide is justifiable:
> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
> (2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
> . . . .
> C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.
> D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

15

When a defendant claims justifiable homicide by an act in self-defense, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. McGill*, 52,600 (La. App. 2 Cir. 4/10/19), 268 So. 3d 346; *State v. Johnson*, 41,428 (La. App. 2 Cir. 9/27/06), 940 So. 2d 711, *writ denied*, 2006-2615 (La. 5/18/07), 957 So. 2d 150. Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Wilkins*, 2013-2539 (La. 1/15/14), 131 So. 3d 839; *State v. Johnson*, *supra*.

In *State v. Wilkins*, *supra,* the Louisiana Supreme Court considered La. R.S. 14:20, Louisiana's "Stand Your Ground" statute. The Court stated:

> [T]he effect of the 2006 La. Acts 141, amending La. R.S. 14:20 and adding subsections C and D to the statute, was two-fold: a person may choose to defend himself or herself with deadly force under the circumstances defined in R.S. 14:20(A), without considering whether retreat or escape is possible, *i.e.*, a person "may stand his or her ground and meet force with force" (C); and he or she may do so without fear that, if it came to it, a jury may nevertheless second guess the decision not to flee from the encounter in assessing whether the use of deadly force was justified (D). The overall effect of the 2006 amendments was thus to supplant a jurisprudential rule so deeply entrenched in Louisiana law that some decisions continue to adhere to it to this day. *See*, *e.g.*, *State v. Vedol*, 12-0376, p. 7 (La. App. 5 Cir. 3/13/13), 113 So. 3d 1119, 1124 ("[T]his Court has continued to recognize that while there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger.").

*Id.* at pp. 1-2, 131 So. 3d at 839-40.

When a defendant challenges the sufficiency of the evidence in a self-defense case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in the defense of others. *State v. McGill*, *supra*; *State v. Davis*, 46,267 (La. App. 2 Cir. 5/18/11), 69 So. 3d 538, *writ denied*, 2011-1561 (La. 1/13/12), 77 So. 3d 952.

The evidence was overwhelming that Johnson did not kill Moore in self-defense. Moore sustained 21 stab wounds. Her blood was found throughout Johnson's house as well as on his vehicle. She had defensive wounds on her hands. In contrast, Johnson sustained only superficial wounds, and these wounds appeared to be fresh even though his victim had been dead for at least one hour. It is also notable, in light of the estimated time of Moore's death, that Johnson told the detectives that he heard a gurgling sound and wheezing coming from Moore after he called 911. Finally, Johnson demonstrated absolutely no urgency in seeking medical help for Moore as he engaged in a six-minute telephone conversation with a friend before calling 911.

Johnson's self-defense claim is also belied by his statements to the police and fire personnel who responded to the 911 call as well as to the detectives investigating the murder.

Detective McDonald testified that he gave Johnson ample opportunity during his interrogation to assert that he injured Moore in self-defense. Johnson was adamant he did not inflict the injuries upon Moore. In fact, he

17

denied stabbing her and expressed disbelief when he was told that she had been stabbed multiple times.

Johnson told detectives that he grabbed a sheet from the floor before running from his house. He also said that he asked his neighbor to use her phone. Pipkins testified when a naked Johnson came to her house, he asked only for a sheet and never indicated that he was in danger or was hurt.

SFD Engineer Chris Henry recalled that Johnson's initial version of events was that he did not know who the victim was and that a stranger had walked into his house as he was getting ready for work. The stranger would not leave when Johnson asked her to leave.

After Johnson was moved to the patrol car to be treated, Henry noticed that the name "Yolanda" was tattooed on Johnson and it was also the name he gave of the woman in his house. When Henry asked Johnson if that was merely a coincidence, Johnson hung his head. Johnson then replied that he knew Moore and that he had tried to get her outside after the altercation.

SPD Corporal Michael Schulz testified that Johnson stated that they had fallen through a glass table after they began struggling. He also testified that while Johnson was being treated by paramedics, he altered his account to say only Moore fell through the glass table. A coffee table with a glass top was in the living room, but the glass was cracked and not shattered.

Johnson also gave varying statements regarding Moore's condition at the time he went to Pipkins' home. Henry recalled that Johnson said he went to the neighbor's home for help in getting the stranger to leave, but he returned to the porch when another person walking down the street told him that someone was lying on his porch. When Johnson was asked how Moore ended up on the porch, he admitted that there had been a brief altercation

18

and that he had pulled her inside and put a fan on her because he thought she was exhausted.

Schulz recalled that when Johnson described his conversation with Pipkins, Johnson indicated that he saw Moore walk to the porch before returning inside. He then followed her inside.

Johnson recounted to the detectives that as he spoke with his neighbor, Moore came onto the porch and sat on a chair. When the neighbor remarked that Moore had fallen down, Johnson ran back to his home, picked Moore up, and brought her into his house.

Pipkins, who could not see Johnson's porch from where she was standing while giving him the sheet, testified that she never pointed out to him that she saw someone on his porch.

In summary, the evidence was sufficient for the jury to find that Johnson stabbed Moore while having the specific intent to kill her or to inflict great bodily harm upon her, and that the homicide was not committed in self-defense or in the defense of others.

Johnson makes the alternative argument that if he was criminally culpable for Moore's death, then he was guilty of manslaughter and not second degree murder.

Manslaughter is defined in La. R.S. 14:31(A)(1) as a homicide that would be first degree or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.

For murder to be reduced to manslaughter, the following elements must be proved: (1) the homicide was committed "in sudden passion or heat

of blood"; (2) that sudden passion or heat of blood was immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; (3) the defendant's blood did not cool between the provocation and the killing; and (4) an average person's blood would not have cooled between the provocation and the killing. *State v. Efferson*, 52,306 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1153, *writ denied*, 2018-2052 (La. 4/15/19), 267 So. 3d 1131; *State v. McGee*, 51,977 (La. App. 2 Cir. 4/3/19), 2019 WL 1461524, __ So. 3d ___. In a prosecution for murder, a defendant who claims provocation (as a means of reducing murder to manslaughter) bears the burden of proving these elements by a preponderance of the evidence; additionally, provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. *State v. Leger*, 2005-0011 (La. 7/10/06), 936 So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007); *State v. McGee*, *supra*.

There was no evidence presented at trial by the defense in support of a manslaughter verdict. Johnson never established that the killing was committed in sudden passion or heat of blood. In fact, Johnson denied to detectives that he was even responsible for Moore's stab wounds.

Johnson's arguments regarding the sufficiency of the evidence are without merit. His conviction of second degree murder was convincingly supported by the evidence presented at trial.

### Evidence of other crimes and acts

Johnson's counsel contends in the next assignment of error that the trial court erred in allowing the introduction of evidence of other crimes and acts committed by Johnson.

20

The State filed five 404(B) notices in this matter seeking introduction of evidence involving prior instances when Johnson threatened, attempted to harm, or actually harmed Moore, other women, and one of Moore's male friends. Several hearings were held on this matter, with the court allowing most of the evidence. Ultimately, Reginald Fleming, Denise Taylor, and Dana Randle testified at trial. The earliest violent incidents, in 1992 and 1993, were testified to by Randle.

Johnson's counsel maintains that the trial court improperly widened the scope of admissible other crimes evidence. She attempts to distinguish *State v. Altenberger*, 2013-2518 (La. 4/11/14), 139 So. 3d 510, on the grounds that (1) the incidents occurred many years prior to the instant offense and involved a different victim in some instances; (2) Randle admitted at the hearing that she and Johnson had been using drugs when the incidents occurred; and (3) Altenberger was accused of domestic abuse rather than murder and the other crimes evidence involved the same victim. Defense counsel argues that even if the evidence here was otherwise admissible, its probative value was outweighed by the prejudicial effects of the evidence. Counsel maintains that the evidence was not used to show motive or intent, but to impermissibly "paint Raymond as a bad guy."

In *State v. Taylor*, 2016-1124, p. 12 (La. 12/1/16), 217 So. 3d 283, 292, the Louisiana Supreme Court explained the concerns underpinning a 404(B)(1) inquiry:

> Code of Evidence article 404(B)(1) embodies the settled
> principle that evidence of other crimes may be admissible if the
> state establishes an independent and relevant reason for its
> admission. While the clear and convincing burden of proof set
> forth in *Prieur* is no longer mandated, other jurisprudential
> rules and guidelines derived from *Prieur* and its progeny
> remain valid and applicable. Thus, the state is still required [to]

21

provide the defendant with written notice before trial that it intends to offer prior crimes evidence. And, the safeguard in *Prieur* providing for a jury charge regarding the limited purpose for which other crimes evidence is presented remains valid. Moreover, even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence must have substantial relevance independent from showing defendant's general criminal character and thus is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. Accordingly, the state cannot simply rely on a boilerplate recitation of the grounds for admissibility stated in La. C.E. art. 404(B). It is the duty of the district court in its gatekeeping function to determine the independent relevancy of this evidence. The district court must also balance the probative value of the other crimes, wrongs or acts evidence against its prejudicial effects before the evidence can be admitted.

(Internal citations omitted).

When seeking to introduce evidence pursuant to La. C.E. art. 404(B), the State need only make a showing of sufficient evidence to support a finding that the defendant committed the other crime, wrong, or act. *State v. Taylor*, *supra*.

Once evidence is deemed relevant and otherwise admissible under La. C.E. art. 404(B)(1), the trial court must still conduct a balancing test pursuant to La. C.E. art. 403. In regards to this balancing test, the *Taylor* court stated:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 403. Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."

*Id*. at p. 18, 217 So. 3d at 295-6 (internal citations omitted).

In *Altenberger*, *supra*, the Louisiana Supreme Court found that evidence of the defendant's pattern of domestic abuse went directly to rebut defenses that he may raise at trial and demonstrated their independent relevancy besides merely painting defendant as a bad person. In *State v. Rose*, 2006-0402 (La. 2/22/07), 949 So. 2d 1236, evidence that the defendant had physically abused the victim in the past was determined to be admissible to show motive for her murder and to demonstrate the volatile nature of their relationship. In *State v. Hunter*, 2015-0306 (La. App. 4 Cir. 9/9/15), 176 So. 3d 530, prior instances of violence involving a couple were admissible to establish motive and to rebut the defendant's claim that he stabbed the victim in self-defense.

The jurisprudence also supports the admissibility of prior acts when the acts were done to a third person other than the victim in the prosecution at hand. *See State v. Colby*, 51,907 (La. App. 2 Cir. 5/30/18), 244 So. 3d 1260, *writ denied*, 2018-1256 (La. 3/25/19), 267 So. 3d 596. In *State v. Howard*, 47,495 (La. App. 2 Cir. 11/14/12), 106 So. 3d 1038, this Court affirmed the trial court's admission of past acts of domestic violence against the defendant's prior girlfriend as tending to prove motive or pattern of domestic violence.

A district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. *Taylor, supra*. Moreover, an erroneous introduction of other crimes evidence is subject to harmless error review. *State v. Reed*, 43,780 (La. App. 2 Cir. 12/3/08), 1 So. 3d 561, *writs denied*, 2009-0014 (La. 10/02/09), 18 So. 3d 100, 2009-0160 (La. 10/2/09), 18 So. 3d 103; *State v. Gatti*, 39,833 (La. App. 2 Cir.

23

10/13/05), 914 So. 2d 74, *writ denied*, 2005-2394 (La. 4/17/06), 926 So. 2d 511.

Erroneous admission of evidence requires reversal only where there is a reasonable possibility that the evidence might have contributed to the verdict. *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The relevant inquiry is whether the reviewing court may conclude the error was harmless beyond a reasonable doubt, i.e. was the guilty verdict actually rendered surely unattributable to the error. *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). *See State v. Casey*, 1999-0023 (La. 1/26/00), 775 So. 2d 1022.

The trial court did not abuse its discretion in allowing the testimony of Taylor, Fleming, and Randle. The testimony of these three witnesses clearly established a pattern of domestic abuse and, as noted by the *Altenberger* court, the fact that the prior instances occurred years before the instant offense is insufficient in and of itself to require exclusion of the evidence. The evidence was properly admissible to show motive and intent. In addition, the probative value of this evidence was not outweighed by any unfair prejudice to Johnson. His long-term pattern of inflicting physical abuse on his partners is highly probative of his intent to inflict great bodily harm or death on Moore. Finally, even if the trial court erred in allowing any or all of the testimony by Fleming, Randle, and Taylor, it was harmless error. Their testimony aside, the remaining evidence was overwhelming that Johnson stabbed Taylor at least 21 times with the intent kill her or to inflict great bodily harm and that he did not do so in self-defense. This assignment of error is without merit.

24

***Request for counsel***

In his final assignment of error, Johnson's appellate counsel contends that the trial court erred in denying his motion to suppress statements that were made by Johnson to Detectives McDonald and McEntee. Counsel maintains that the detectives continued to question Johnson even after he made an unequivocal request for an attorney by stating "I guess I better get a lawyer" early in the interrogation. Counsel further argues that the detectives should have ceased questioning him at that point, and the failure to terminate questioning warranted suppressing the statements.

The State counters that Johnson did not make an unequivocal request for an attorney or to have counsel present before questioning continued. Detective McDonald did not hear any request because he was talking at the same time Johnson mumbled the remark. In addition, Johnson's remark was not an unambiguous or unequivocal request that would have led a reasonable officer to believe that Johnson was invoking his right to counsel.

In reviewing a trial court's pretrial ruling on a motion to suppress, the appellate court must look at the totality of the evidence presented at the hearing on the motion to suppress and may review the entire record, including testimony at trial. *State v. Bates*, 51,890 (La. App. 2 Cir. 2/28/18), 246 So. 3d 672. Great weight is given to the trial court's ruling on a motion to suppress in regard to its factual findings because it had the opportunity to observe the witnesses and weigh the credibility of their testimony. *State v. Thibodeaux*, 1998-1673 (La. 9/8/99), 750 So. 2d 916, *cert. denied*, 529 U.S. 1112, 120 S. Ct. 1969, 146 L. Ed. 2d 800 (2000); *State v. Odums*, 50,969 (La. App. 2 Cir. 11/30/16), 210 So. 3d 850, *writ denied*, 2017-0296 (La. 11/13/17), 229 So. 3d 924. Accordingly, appellate courts review rulings on

motions to suppress under the manifest error standard for factual determinations while applying a *de novo* review to the findings of law. *State v. Bates*, *supra*.

Before the State may introduce a confession into evidence, it must demonstrate that the statement was free and voluntary and not the product of fear, duress, intimidation, menace, threats, inducements or promises. La. R.S. 15:451; La. C. Cr. P. art. 703(D); *State v. Blank*, 2004-0204 (La. 4/11/07), 955 So. 2d 90. If a statement is a product of custodial interrogation, the State additionally must show that the person was advised before questioning of his right to remain silent; that any statement he makes may be used against him; and, that he has a right to counsel, either retained or appointed. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We may infer that the trial court concluded that the State had satisfied both of these requirements.

A trial court's finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless not supported by the evidence. *State v. Benoit*, 440 So. 2d 129 (La. 1983); *State v. Washington*, 51,818 (La. App. 2 Cir. 4/11/18), 245 So. 3d 1234, *writ denied*, 2018-0783 (La. 12/17/18), 259 So. 3d 343. Testimony of the interviewing police officer alone may be sufficient to prove that a defendant's statement was given freely and voluntarily. *Id.*

The inquiry in cases where the defendant claims he invoked his right to counsel is whether the statement was clear and unambiguous under the circumstances so as to put a reasonable police officer on notice that defendant was invoking his right to counsel during custodial interrogation. *State v. Payne*, 2001-3196 (La. 12/4/02), 833 So. 2d 927.

26

Regarding the right to counsel during custodial interrogations, the

Louisiana Supreme Court has explained:

> When an accused has invoked his right to have counsel present
> during custodial interrogation, a valid waiver of that right
> cannot be established by showing only that he responded to
> further police-initiated custodial interrogation even if he has
> been advised of his rights. Once an accused has expressed his
> desire to deal with the police only through counsel, he is not
> subject to further interrogation by the authorities until counsel
> has been made available to him, unless the accused himself
> initiates further communication, exchanges or conversations
> with the police. It is inconsistent with *Miranda* and its progeny
> for the authorities, at their insistence, to reinterrogate an
> accused in custody if he has clearly asserted his right to
> counsel.
> . . . . .
> The applicability of the "'rigid' prophylactic rule" of *Edwards*
> requires courts to "determine whether the accused actually
> invoked his right to counsel." To avoid difficulties of proof and
> to provide guidance to officers conducting interrogations, this is
> an objective inquiry. Invocation of the *Miranda* right to counsel
> "requires, at a minimum, some statement that can reasonably be
> construed to be an expression of a desire for the assistance of an
> attorney." If a suspect makes a reference to an attorney that is
> ambiguous or equivocal in that a reasonable police officer in
> light of the circumstances would have understood only that the
> suspect *might* be invoking the right to counsel, the cessation of
> questioning is not required. The suspect must articulate his
> desire to have counsel present with sufficient clarity that a
> reasonable police officer in the circumstances would understand
> the statement to be a request for an attorney. In analyzing the
> prophylactic rules of *Miranda* and *Edwards*, we are mindful
> that the "value of any prophylactic rule ... must be assessed not
> only on the basis of what is gained, but also on the basis of
> what is lost." "Admissions of guilt are more than merely
> desirable; they are essential to society's compelling interest in
> finding, convicting, and punishing those who violate the law."

*Id.* at pp. 8-10, 833 So. 2d at 935-6 (internal citations omitted).

In *Soffar v. Cockrell*, 300 F. 3d 588 (5th Cir. 2002), the appellate

court considered questions asked by Soffar during custodial interrogation

concerning whether he should get an attorney, how he could get one, and

how long it would take to have an attorney appointed. The 5th Circuit noted

27

that each question had been rejected as being procedural and too equivocal to constitute a clear invocation of counsel.

In *Davis v. U.S.*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), the Supreme Court declared that the suspect must "unambiguously request" counsel "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" in order to cease custodial interrogation. The Court held that after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. *Davis* established a bright-line rule, under which a statement either is an assertion of the right to counsel or it is not. *Soffar*, *supra*.

The *Davis* court specifically declined to extend *Edwards v. Arizona*, 451 U.S 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), by requiring law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. In doing so, the Court stated:

> The rationale underlying *Edwards* is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity," *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S. Ct. 321, 326, 46 L. Ed. 2d 313 (1975), because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in *Edwards* requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer.... We also noted [in *Miranda*] that if a suspect is "indecisive in his request for counsel," the officers need not always cease questioning.

28

*Davis*, 512 U.S. at 460, 114 S. Ct. at 2355-6.

After being advised of his rights, Johnson asked the detectives if he needed a lawyer. Detective McDonald advised Johnson that he could not give him legal advice but told him that he could have an attorney if he wanted one. Johnson freely answered questions thereafter. At 14:53 on the recording, Johnson made the barely audible comment, "I guess I better get a lawyer." On the recording, Detective McDonald is talking at the same time that this comment was made. The trial judge noted in her reasons for ruling that she had to listen to the recording ten times to even discern what Johnson was saying. Detective McDonald testified at the suppression hearing that at no time did he understand Johnson to request an attorney. After hearing the audio recording in court, Detective McDonald commented that he could hear some vague possible reference to a lawyer, but he could not hear exactly what was said.

Johnson failed to show that he invoked his right to counsel in a clear manner such that a reasonable police officer in the circumstances would have understood the statement to be an unequivocal request for an attorney and that custodial interrogation was to be terminated. Accordingly, the trial court did not abuse its discretion in denying Johnson's motion to suppress his statements to Detectives McDonald and McEntee. This assignment of error is without merit.

## CONCLUSION

For the reasons stated above, Johnson's conviction and sentence are AFFIRMED.

29